[No. 32362. Department One. March 4, 1954.]

E. I. Du Pont de Nemours and Company, *Appellant*, v. The State of Washington, *Respondent and Cross-appellant*, United States of America, *Appellant*.[1]

[1]Reported in 267 P. (2d) 667.

*Reuben C. Carlson (H. Brian Holland, Ellis N. Slack, Hilbert P. Zarkey, Lyle M. Turner,* and *Erwin A. Goldstein,* of counsel), for appellants.

*The Attorney General* and *Jennings P. Felix, Assistant,* for respondent and cross-appellant.

HAMLEY, J.—This action was brought by E. I. Du Pont de Nemours & Company, to recover business and occupation taxes aggregating $856,736.45, paid by the company. The taxes were collected by the state of Washington under title Il of the revenue act of 1935 (Laws of 1935, chapter 180, as amended). The tax imposed under title II is an excise tax levied solely for revenue purposes on persons

engaged in specified businesses and occupations. Among the persons so taxed are those engaging in the business of making sales at retail. Rem. Supp. 1943, § 8370-4 (c) [cf. RCW 82.04.250]. The amount of tax is equal to one quarter of one per cent of the gross proceeds from such sales. Rem. Supp. 1943, § 8370-4 (c).

 The term "sale at retail" or "retail sale," as defined in this act, is broad enough to include the sale of or charge for tangible personal property consumed, and labor and services rendered, in performing contracts of the kind described below. See Rem. Supp. 1943, § 8370-5 (d) [cf. RCW 82.04.050]. It is not contended on this appeal that there was any lack of statutory authority to impose the tax.

This tax was exacted from Du Pont during the period between March, 1943, and December, 1946, in connection with the company's work and activities in constructing, managing, and operating the Hanford Engineer Works in eastern Washington. The company performed this work under a cost-plus-fixed-fee contract authorized by the first war powers act of 1941 (50 U. S. C. A. Appendix 601 *et seq.*, 55 Stat. 838). The fixed fee provided for in the contract was one dollar. The contract was executed on November 6, 1943, effective as of October 3, 1942, when Du Pont entered into the performance of the work.

Du Pont seeks recovery of the taxes paid on the ground that, under the circumstances of this case, such taxation is invalid and void because violative of the constitution of the United States. General Electric Company, which managed and operated Hanford Engineer Works after September 1, 1946, instituted a similar action to recover tax payments made after it took over as prime contractor. In addition to the constitutional question, the General Electric suit involved the question of whether, as to business conducted on and after January 1, 1947, General Electric was exempt from such tax by virtue of § 9 (b) of the atomic energy act of 1946 (42 U. S. C. A. 1809 (b), 60 Stat. 765).

The government intervened in both actions and supported the position taken by the respective plaintiffs. The

two cases were consolidated for trial. In the Du Pont case, now before us, judgment was rendered for defendant. In the General Electric case, judgment was rendered for plaintiff as to taxes measured by the gross proceeds of the business conducted on and after January 1, 1947. The trial court held, in effect, that as to both Du Pont and General Electric the tax did not violate the constitution of the United States, but that as to General Electric the collection of such tax after December 31, 1946, was forbidden by § 9 (b) of the atomic energy act.

In the General Electric case the state appealed. General Electric and the government resisted the appeal, but did not cross-appeal. The only question presented for our consideration on that appeal was as to the effect to be given to § 9 (b). In a six-to-three decision, we reversed the trial court and directed a dismissal of the action. *General Electric Co. v. State,* 42 Wn. (2d) 411, 256 P. (2d) 265. Our decision was reversed by the supreme court of the United States on February 8, 1954. *General Electric Co. v. State,* 347 U. S. 909, 74 S. Ct. 474. Section 9 (b) of the atomic energy act has been repealed, effective as to tax liabilities accruing on or after October 1, 1953. 42 U. S. C. A. 1809, 60 Stat. 765.

Du Pont took this separate appeal, again joined by the government. Du Pont and the government will be referred to herein as appellants. As the sole basis for reversal, they renew the constitutional argument which was presented in the trial court, but which was not before us on the appeal in the *General Electric* case.

The pertinent facts, as found by the trial court, are not in dispute. Hanford Engineer Works was built and operated by Du Pont for the production of fissionable materials. The contract covered not only the construction and operation of facilities for the manufacture of these materials, but also the performance of many related engineering, architectural, and research services. It also included the construction, management, and operation of extensive housing and business facilities required to meet the needs of employees, together with all necessary municipal services.

Hanford Engineer Works occupies an area comprising in excess of four hundred thousand acres. The government acquired this land by purchase or condemnation for the sole purpose of constructing and operating this plant. While the government did not take exclusive jurisdiction of the area, it did control all ingress and egress to and from the area, and only those with official business and appropriate identification and security clearance were permitted in the area.

Under the contract, Du Pont provided the personnel and certain technical experience. The government provided the facilities and money. Upon consultation with the contractor, the government also formulated the policies and programs to be carried out. All the work and services to be performed under the contract were subject in all respects to the approval of the contracting officer representing the government. All practices and procedures, safety regulations, and other measures dealing with health hazards inherent in the production of radioactive materials were prescribed or approved by the government. The contractor was also required to dismiss employees deemed by the government to be incompetent, careless, or insubordinate, or whose continued employment was deemed to be inimical to the public interest.

Du Pont owned none of the real or personal property which it operated or managed. The contract provided that the government would own all property and equipment utilized by Du Pont; would have title to all drawings, designs, specifications, and patents conceived or created under the contract; and would have complete control over the product and all of its component parts while in process and after manufacture. The government took delivery of the product at the plant upon the completion of the final processing, and Du Pont had no further responsibility for the product thereafter.

Title to property furnished by the government for use by Du Pont remained in the government. Title to all materials purchased by Du Pont and for which it was entitled to reim-

bursement vested in the government. Under the contract, Du Pont was authorized to lease, transfer, or otherwise dispose of government-owned property in its possession to such persons and upon such terms and conditions as might be approved or ratified by the government representative.

In the conduct of its work for the government, Du Pont purchased a large volume of tools, machinery, equipment, facilities, supplies, and other materials. Every purchase of materials in excess of two thousand dollars required the approval of the government representative. The contractor purchased these materials and supplies in its own name. The price and other terms and conditions of sale of any materials or equipment manufactured by Du Pont and used on the project were likewise subject to the approval of the government.

Du Pont managed the government-owned housing facilities, granted leases and concessions of government-owned facilities to business enterprises, and collected rents and fees for the government under such arrangements. The contract provided that, for the purpose of leasing houses, stores, and other buildings, the contractor was appointed an agent of the government.

The contract provided that the work was to be performed entirely at the expense of the government. The government was required to indemnify and hold Du Pont harmless against any delay, failure, loss, expense, or damage of any kind arising out of or connected with the work, unless caused directly by bad faith or willful misconduct on the part of some corporate officer within the scope of his authority and employment. This provision, which is extraordinary in government contracts, was approved by the president of the United States.

The contract also provided that the government should assume and carry on the defense of all claims, suits, or legal proceedings which would be asserted or instituted against Du Pont on account of acts or omissions in the performance of the work. In addition, the government was obliged to pay directly and discharge completely all final judgments

entered against Du Pont in such litigation, and all claims which were settled by agreement, approved by the government representative.

The nature of the work was such that it involved a tremendous outlay of cash, which the government provided. The government made advances which were deposited in a special bank account, clearly identified with the contract and subject to the terms of the contract under which the advance payment was made. The government was empowered under the contract to stop withdrawals by Du Pont from the special deposit by notifying the bank where the fund was located. From the fund so created, Du Pont paid the salaries of its employees, the cost of material procured for the work, and any and all other expenses incurred under the contract. The government reserved the right to pay third parties directly all sums due and arising under the contract.

As the work under the contract progressed and moneys were expended from the advanced fund, the government, upon a request by the contractor, made reimbursements. The result was that the special bank account in effect operated as a revolving fund. Du Pont thus had a current supply of money available to finance the operation, and was never required to utilize its own funds.

Added to the deposit of these reimbursements was the deposit of funds collected by Du Pont from other sources available to it in its performance of the contract. Du Pont made collections for rents, hospital charges, sales to employees, bus fares, and miscellaneous sales and services. These collections were likewise deposited in the special account. Further, the government was compensated for some of the previously-mentioned items by payroll deductions.

From the date of Du Pont's entry upon the performance of the contract until its completion, the tax commission of the state of Washington took the position that the amounts received by Du Pont were includible in its gross income for the purpose of computing the tax payable under title II of the revenue act of 1935, as amended. The tax commission demanded of Du Pont payment in full of the tax so levied.

The taxes collected by the state pursuant to that demand have been measured by the total amount of reimbursements for labor and materials, that is, the cash (other than advances) paid into the account by the government, the funds received by Du Pont from third persons and deposited in the account, and credits received through payroll deductions. The record is not clear, however, as to whether rentals collected by Du Pont as agent for the government were included within the measure of taxable income in making reports to the state.

In contending that the taxes so exacted are invalid under the Federal constitution, appellants invoke the principle that the possessions, institutions, and activities of the Federal government itself, in the absence of express congressional consent, are not subject to any form of state taxation. *McCulloch v. Maryland*, 4 Wheat. 316, 4 L. Ed. 579, 17 U. S. 159; *Mayo v. United States*, 319 U. S. 441, 87 L. Ed. 1504, 63 S. Ct. 1137, 147 A. L. R. 761.

Applying this principle, appellants argue that the tax in question is measured by the deposits of Federal funds in a government-controlled bank account which was useable by Du Pont solely for the limited Federal purposes prescribed in Du Pont's contract, and that it is therefore in actuality a tax upon the Federal funds and not upon Du Pont's privilege of engaging in business. *United States v. Allegheny County*, 322 U. S. 174, 88 L. Ed. 1209, 64 S. Ct. 908, is cited in support of this proposition.

In arguing that the funds deposited in the special bank account were owned by the government, appellants point out that all such funds were supplied by the government; that they were completely segregated from the general funds belonging to the contractor; that they could be used only in connection with the Hanford project; and that any balance remaining in the account on completion of the contract was to be returned to the government.

But there are other provisions of the contract relating to this special bank account which must also be considered. For example, the advanced funds were designated "advance

payments." It was provided that the special bank account would be "separate from the contractor's general or other funds," thus implying that the special account was to be in the contractor's name. As a condition precedent to the making of advance "payments" by the government, the contractor was required to post security. The contract gave the government a "lien" upon the balances in the special account to secure the "repayment" of advances.

Under the contract, money from the special account was to be withdrawn upon checks endorsed or signed by the contractor. Upon the completion or termination of the contract, the unliquidated balance of such advance payments was to be deducted from any "payments otherwise due the contractor." If the contractor failed to return the balance of advances in the fund when required under the contract, the amount demanded would bear interest at the rate of six per cent per annum until paid. The government was given a contract right to audit the special bank account.

These contract provisions, considered together, indicate that withdrawals from the special account were subject to strict government supervision, but that the funds themselves, from whatever source received, were intended to be the property of the contractor. Appellants' position that these were Federal funds is therefore untenable.

█ Equally untenable is appellants' argument that the tax in question is a tax upon the funds deposited in the special account. This is not an *ad valorem* tax. It is a tax levied upon *persons* engaged in specified business activities. The tax is measured by the application of the prescribed rate against the gross proceeds of any such business.

The gross proceeds of the business here in question consist of cash reimbursements received from the government, funds received from third persons, and credits received through payroll deductions. The tax would be measured by the application of the prescribed rate to these proceeds, wherever they were deposited or whatever the contractor did with them.

In *United States v. Allegheny County, supra*, relied upon by appellants, government-owned machinery was placed in

a factory owned by the contractor. The contract provided for the lease of such machinery to the contractor. It was specified that the liability of the company for loss, damage, or destruction of equipment was "that of a bailee under a mutual benefit bailment." Under the contract, the machinery was utilized by the contractor in the manufacture of field guns, which were delivered to the government at a fixed price each. After installation of the machinery, the county authorities revised the contractor's previously-determined *ad valorem* taxes by adding thereto the value of the government-owned machinery. The United States supreme court declared the tax invalid, holding that it was, in substance, an *ad valorem* general property tax on property owned by the United States.

The *Allegheny* case is here inapplicable, because the tax now under consideration is not an *ad valorem* tax, and it was not levied against property of the government.

Appellants also argue that Du Pont was, in effect, an instrumentality of the government in the performance of this work, and that the tax was therefore in actuality exacted from the government. In this connection, appellants point not only to the special bank account arrangement, but to a number of other features of the contract. Principal among these are the provisions under which the contractor's fixed fee was limited to one dollar; the government undertook to pay all of the contractor's expenses, including taxes and judgments; the government became and remained the owner (with minor exceptions) of all the real and personal property utilized in performing the contract; and the government exerted unusual supervisory controls over every phase of the contractor's activity.

The argument thus advanced presents two questions: (1) Do these contract features establish that Du Pont was an agent for the government rather than an independent contractor? (2) If Du Pont was an independent contractor rather than an agent, do these contract provisions nevertheless establish a special relationship between the contractor and the government, whereby the contractor became immune from the business and occupation tax?

We will first consider the question of agency.

Under article II, paragraph 7, of the contract, Du Pont was expressly designated an agent of the government for the purpose of collecting rentals on government-owned staff houses, stores, and other buildings located on the plant site. This contract provision will be further discussed below.

In no other respect was Du Pont expressly designated an agent, or given the status of an agent to enter into contracts for the government, or to pledge the government's credit. While the contract was being negotiated, the tax commission suggested a provision for inclusion therein, which, if followed, would have constituted Du Pont an agent for the government in the purchase of supplies and materials. Du Pont was unwilling to include that provision, and the government did not insist upon it, though both knew that, unless included, the tax commission would regard Du Pont as an independent contractor.

Absent contract provisions of the kind referred to above, the fact that the government reserved and exercised the right to restrict or control the action of the contractor as to its general activities does not establish the existence of an agency relationship. *Alabama v. King & Boozer*, 314 U. S. 1, 86 L. Ed. 3, 62 S. Ct. 43, 140 A. L. R. 615. Nor, in the absence of such provisions, do the other unique features of the contract, relied upon by appellants, require or warrant such a conclusion.

Since Du Pont was not an agent for the government in its general activities under the contract, the company's status was that of an independent contractor. Appellants have not challenged the trial court's conclusion of law to that effect.

This brings us to the question of whether Du Pont, though an independent contractor, maintained such a special relationship with the government under the unique features of this contract that the contractor became immune from such taxation.

It has frequently been held that the fact that the economic burden of a tax upon an independent contractor

rests upon the government does not render the tax invalid. *U. S. v. Allegheny County, supra*; *Esso Standard Oil Co. v. Evans*, 345 U. S. 495, 97 L. Ed. 1174, 73 S. Ct. 800, 114 A. L. R. 318; *James v. Dravo Contracting Co.*, 302 U. S. 134, 82 L. Ed. 155, 58 S. Ct. 208, 114 A. L. R. 318; *Alabama v. King & Boozer, supra.* Even the government's express assumption of a contractual obligation to pay an independent contractor's taxes does not operate either to waive or to create an immunity. *U. S. v. Allegheny County, supra.*

It is also without significance that all of the real and personal property utilized in performing the contract was owned by the government. *Esso Standard Oil Co. v. Evans, supra*; *Alabama v. King & Boozer, supra.* The same is true with regard to the fact that the government exerted unusual supervisory controls over every phase of the contractor's activity. *Alabama v. King & Boozer, supra.*

The unusual character of the Hanford project made it necessary to incorporate in the Du Pont contract a number of unique provisions of the kind dealt with in the above-cited cases. But, as established by those decisions, their function was not to establish tax immunity, and they did not effectuate that result.

Had the government desired to attain tax immunity, several courses of action were available. It could have assembled an organization, created a government-owned corporation, and erected a plant which would have been wholly tax immune. *Clallam County v. United States*, 263 U. S. 341, 68 L. Ed. 328, 44 S. Ct. 121. Tax immunity could have been attained had Du Pont been designated and treated as an agent of the government in the performance of the work. The same result would have been achieved had the government acquired exclusive jurisdiction over the area where this work was performed. *Surplus Trading Co. v. Cook*, 281 U. S. 647, 74 L. Ed. 1091, 50 S. Ct. 455. Tax immunity could also have been obtained had Congress enacted a statute, effective during the period in question, expressly immunizing from state taxation the work performed by Du Pont under the contract. *General Electric Co. v. State,*

347 U. S. 909, 74 S. Ct. 474. The government followed none of these courses.

■ We therefore hold that, except as to certain rental collections dealt with below, the legal incidence of this tax fell upon Du Pont, and not the government, and that the tax was validly exacted.

As above noted, under article II, paragraph 7, of the contract, Du Pont was expressly designated agent for the government for the purpose of collecting certain rentals on government-owned property. Some of these rentals were collected in cash and deposited in the special bank account. The remainder were collected in the form of payroll deductions from the wages and salaries of employees working at the plant. This matter was discussed during the trial, and respondent's counsel asked appellants' counsel to stipulate that the amounts received by Du Pont, as agent for the government under this contract provision, were not included within the measure of taxable income in making reports to the state.

Counsel for appellants felt that he did not have enough information regarding the matter to enter into such a stipulation. The following colloquy then took place:

"MR. ROSENBERG [attorney for respondent]: If the Court please, we would like to stipulate on the record in that regard to this effect: That should it be shown at any time, regardless of the outcome of these cases, this was included in the measure of tax liability by either of these companies, the amounts to which we just had reference may be deducted as having been improperly reported.

"MR. GREEN [attorney for appellants]: That is my understanding with Mr. Jenner and Mr. Rosenberg and Mr. Kaminoff: That depending on the outcome of this litigation there will, if necessary, or if the State prevails in these cases and it be discovered Du Pont or General Electric have not reported what they should have reported by way of omission or way of misunderstanding, then these two companies will see that the State gets the proper amount, irrespective of limitation or otherwise. As I understand from the statement, that the State, if it discovered there was error in favor of the contractor, that would be taken care of by agreed judgment in this Court. . . ."

We construe this stipulation as applying to rentals collected by payroll deductions as well as in cash, and as binding upon respondent regardless of whether Du Pont followed statutory procedure in claiming a refund of taxes measured by such rentals.

In view of the conclusion just stated, it is unnecessary for us to consider the argument, advanced by respondent in its cross-appeal, that Du Pont is precluded from obtaining a refund of taxes paid because it failed to follow the prescribed statutory procedure relative to tax refunds.

The judgment is affirmed, but without prejudice to Du Pont's right, under the stipulation referred to above, to a refund of taxes measured by rentals which it collected as agent for the government under article II, paragraph 7, of the contract.

GRADY, C. J., MALLERY, FINLEY, and OLSON, JJ., concur.

April 12, 1954. Petition for rehearing denied.