CAPITOL CONSTRUCTION CO. ET AL., Petitioners and Appellees, v. SECRETARY OF THE TREASURY, Respondent and Appellant.

No. R-62-43.      Decided October 28, 1963.

320

■■■■■■■■■■■■■■

J. B. *Fernández Badillo, Solicitor General,* for appellant. *Mc-Connell, Valdés & Kelley,* and *Wallace González Oliver* for appellees.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

On February 2, 1962 the Superior Court, San Juan Part, rendered judgment sustaining several complaints filed by the corporations Capitol Construction Co. and the Blythe Co. of Puerto Rico in which they challenged the levying of taxes on certain personal property belonging to petitioners, which at the time of taxation was physically located in the United States of America military bases, Ramey Field, and Roosevelt Roads. It stated that the ruling established in *P.R. Drydock* v. *Sec. of the Treas.*, 82 P.R.R. 636 (1961), was entirely applicable "in the light of the statements" contained therein, although it admitted that the case of Drydock involved the personal property of a leaseholder of federal land, while the present case dealt with property of identical nature belonging to contractors for the construction work. Even when subsequently, on June 22, 1962, 85 P.R.R. 707, we reconsidered the judgment rendered in Drydock, it has no bearing on the contentions now raised for our last action merely dealt with the interpretation of the term "alienation" as used in § 5 of the Act of February 16, 1903 (Sess. Laws, p. 110).

The appellees are corporations organized under the laws of the Commonwealth of Puerto Rico, which are engaged in construction work and civil engineering in general, for which they possess construction equipment, furniture, tools, and other accessories. In order to decide the controversy as to the taxable nature of said property, the parties submitted to the trial court a stipulation of facts which insofar as pertinent reads as follows:

"1. That in all the above-entitled cases the facts are the following:

"a. The Commonwealth of Puerto Rico sent to each petitioner receipts notifying them of the tax on personal property.

"b. In each case each one of said receipts covered light and heavy construction equipment, accessories and tools which were located at the time of assessment on the United States

military bases located in Puerto Rico (Ramey and Roosevelt Roads).

"c. In each case the construction equipment was located on said bases in relation to construction works of landing strips, buildings, hangars, and other military installations therein.

"d. The officials of the Department of the Treasury have examined each of the taxpayer's records and have decided that the personal property in question is located in good faith on said bases in connection with extensive construction projects on said bases; that is, it is not a matter of the taxpayers moving a great part of their equipment within the bases on the date of assessment in order to avail themselves of a more favorable tax status; rather, practically all the personal property in question was not only located on said military bases on the assessment date, but also practically all said property remained on said bases for long periods of time to carry out the construction work therein.

"e. In none of the above-entitled cases was the taxpayer the owner or the lessee of any part of the lands on said bases where the personal property in question was located.

"2. That in view of the facts stipulated under paragraph '1,' subdivisions 'a' to 'e,' the sole question to be decided by the court in each one of said cases is a question of law, namely: Can the Commonwealth of Puerto Rico levy taxes on a taxpayer's personal property which is located in the United States' military bases in Puerto Rico for the purpose of carrying out construction projects on said bases?"

■ The seventeenth clause of § 8 of Article 1 of the Constitution of the United States confers the power on Congress to exercise the exclusive right *to legislate in all matters whatsoever* concerning all lands purchased with the consent of the legislative power of the State in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other necessary buildings. Although in *Moore* v. *District Court,* 59 P.R.R. 618, 621 (1941), we decided that said clause was not applicable in Puerto Rico, we stated that resort may and should be had to the decisions construing the same, in view of the fact that the local law on the matter—§ 5 of

the Act of February 16, 1903 (Sess. Laws, p. 110)—was conceived in similar terms.[1] We can take judicial notice of the fact that the lands for the construction of Ramey Air Base as well as those for Roosevelt Roads Naval Base were acquired by the federal government prior to 1955, and so, pursuant to the aforecited section, the jurisdiction of the Commonwealth over said land ceased thereafter, and it is now exclusively in the United States.[2]

---

[1] "That consent be and is hereby given, to the United States to acquire for naval, military or other public purposes, by purchase or condemnation, any lands within the island of Porto Rico, and when so acquired and possession thereof shall have been taken by the United States, all jurisdiction over such lands by the People of Porto Rico shall cease and determine [terminate]; Provided, however, that upon the subsequent alienation by the United States of any land so acquired, the People of Porto Rico shall again have jurisdiction thereover."

Said § 5 was amended by Act No. 2 of November 18, 1953 (Sess. Laws 1954, p. 2), to include the lease of lands by the United States as one of the means by which the jurisdiction of the Commonwealth over such lands, shall ipso facto cease and terminate.

Act No. 63 of June 10, 1955 (Sess. Laws, p. 228), repealed said § 5. The provisions now in force in relation to the grant of jurisdiction to the United States over lands acquired by the latter in the Commonwealth of Puerto Rico are contained in Act No. 62 of June 10, 1955 (28 L.P.R.A. (Supp. 1962) §§ 54–57).

[2] The scope of acceptance of jurisdiction by the federal government was not established either, as required by 54 Stat. 19 (1940), 40 U.S.C. § 255, which insofar as pertinent says:

"Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired [February 1, 1940] by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated. *Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be con-*

■ As we said in our first opinion in the *Drydock* case, *supra* at p. 640, "The exclusive jurisdiction which the Government of the United States acquires by virtue of clause 17 of § 8, Art. I of the Constitution (in Puerto Rico by virtue of the Act of February 16, 1903) exempts from state taxation property thus acquired and property located on these premises, even though the latter belong to private institutions and are not [federal] government property." It is not a matter of taxation on federal property or property belonging to an individual taxpayer in which case, perhaps, the problem might be considered in the light of the tendency not to extend federal tax immunity to the entities doing business with the government—but simply of the absence of the state's tax power to reach property located within exclusively federal jurisdiction.

■ *Surplus Trading Co.* v. *Cook*, 281 U.S. 647 (1930), is the leading case on this matter. The federal government acquired by purchase certain lands located within the limits of the State of Arkansas with the consent of the legislature of the State for the purpose of devoting them to a military camp for the training of troops and the establishment of a supply station. The plaintiff corporation bought from the government certain surplus property—a large quantity of woolen blankets—a few days before the date fixed by the state law for the listing of property for the purpose of taxation. On the date stated the greater part of the blankets was still in the army storehouses within the limits of the camp. In maintaining that said personal property was not subject to the jurisdiction of Arkansas, the following language was cited with approval from *United States* v. *Cornell*, 2 Mason

---

clusively *presumed that no such jurisdiction has been accepted."* (Italics ours.)

See *International Business Machine Corp.* v. *Ott,* 89 So.2d 193 (La. 1956). *Cf. International Business Machine Corp.* v. *Vaughn,* 98 So.2d 747 (Fla. 1957).

60: "When therefore a purchase of land for any of these purposes is made by the national government, and the state legislature has given its consent to the purchase, the land so purchased by the very terms of the constitution ipso facto falls within the exclusive legislation of congress, and the state jurisdiction is completely ousted. This is the necessary result, for exclusive jurisdiction is the attendant upon exclusive legislation; and the consent of the state legislature is by the very terms of the constitution . . . a virtual surrender and cession of its sovereignty over the place." This doctrine has been consistently ratified by the federal courts. *Standard Oil Co. of Cal.* v. *California*, 291 U.S. 242 (1934); *S.R.A.* v. *Minnesota*, 327 U.S. 558, 562–563 (1946); *James Stewart & Co.* v. *Sadrakula*, 309 U.S. 94 (1940); *Hardin County Bd. of Super.* v. *Kentucky Limousines*, 293 S.W.2d 239 (Ky. 1956); *Board of Equalization, etc.* v. *General Dynamics Corp.*, 344 S.W.2d 489 (Texas 1961); *International Business Mach. Corp.* v. *Vaughn*, 98 So.2d 747 (Fla. 1957). *Cf. Wilson* v. *Cook*, 327 U.S. 474, 488 (1946); *Mississippi River Fuel Corporation* v. *Fontenot*, 234 F.2d 898 (5th Cir. 1956); *International Business Machines Corp.* v. *Evans*, 99 S.E.2d 220 (Ga. 1957); *E. I. Dupont de Nemours & Co.* v. *State*, 267 P.2d 667, 673 (Wash. 1954). However, to mitigate the harshness of this doctrine, which incidentally is restrictively applied because it partakes of the characteristic to annul state autonomy in purely local matters, it has been recognized that states have the power to levy taxes —whether property tax, license, excise or income tax—when (1) Congress has so expressly authorized it, like in the classic examples of the Buck Act, 4 U.S.C. § 104, and the Military Leasing Act, 10 U.S.C. § 2667(e); *Offutt Housing Co.* v. *Sarpy County*, 351 U.S. 253, 256–257 (1956); *Howard* v. *Commissioner*, 344 U.S. 624 (1953); *cf. Gearheart* v. *Haskell*, 87 P.R.R. 53 (1963); (2) the federal govern-

ment has divested itself of the property interests of the lands acquired with the consent of the state, *Commissioner of Sinking Fund* v. *Howard*, 248 S.W.2d 340 (Ky. 1952);[3] and (3) the state has reserved concurrent jurisdiction over the lands in granting its consent for the acquisition of said lands by the national authorities, *James* v. *Dravo Contracting Co.*, 302 U.S. 134 (1937); *Arapajolu* v. *McMenamin*, 249 P.2d 318 (Cal. 1952).[4] As may be readily decided from an examination of the former statement of facts, contrary to what occurred in *Drydock*, none of these three circumstances are present in this case. Precisely in *Drydock* we upheld the authority of the Commonwealth to levy taxes on the ground that in leasing a drydock the United States

---

[3] Section 4 of Act No. 62 of June 10, 1955, 28 L.P.R.A. § 57, contains a provision to the effect that the jurisdiction granted shall continue only while the United States is the proprietor or is in possession of the lands and the lands are used for the naval, military and other public purposes.

Even under the Act of 1903, it provided for the reversion of jurisdiction when the federal government "alienated" the lands.

[4] Under the law in force—Act No. 62 of June 10, 1955, 28 L.P.R.A. §§ 54–57, the Commonwealth gives its consent for the acquisition of any lands by the United States, but the jurisdiction over said lands shall remain with the Commonwealth of Puerto Rico, except when the cession is granted in the manner provided by § 2 of the Act. Upon previous request by an authorized officer of the federal government (see 40 U.S.C. § 255), the Governor may consent to the cession of jurisdiction subject to the conditions stipulated in § 3—arrests, summonses, and attachments originating under the laws of the Commonwealth may be made, attachments may be executed, and other judicial provisions as the state courts may decide with regard to properties located on said lands, provided the properties of the United States are not affected—*"and whatever other conditions he deems advisable."* For future cases the retention of the jurisdiction to levy taxes on property or activities of private persons which are located or performed within federal lands thus acquired might well be a convenient condition for the cession of jurisdiction.

By § 6 of the Act of 1903, *supra;* as amended by Act No. 63 of June 10, 1955 (Sess. Laws, p. 228), 28 L.P.R.A. § 46 (Supp. 1962), the Commonwealth shall retain concurrent jurisdiction with the United States over offenses and crimes committed within the limits of the lands so conveyed on the Island of Culebra, under certain conditions.

had "alienated" the property and hence, had divested itself from the property interests of the land.

■ The appellant Secretary acknowledges that a state is not empowered to levy a direct tax on the United States or its property—a principle which stems from the memorable opinion of Mr. Chief Justice Marshall in *M'Culloch* v. *Maryland*, 4 Wheat. 316 (1819), in the days when a solid base for the system of federal government was established—but insists that this immunity of constitutional descent does not exonerate third parties doing business with the United States merely because part or all of the economic burden eventually falls on the federal government, *James* v. *Dravo Contracting Co.*, 302 U.S. 134 (1937); *Graves* v. *New York*, 306 U.S. 466 (1939); *Alabama* v. *King & Boozer*, 314 U.S. 1 (1941). See, Annotation, *Immunity from state taxation of independent contractors with United States or federal agencies—Supreme Court cases*, 2 L.Ed.2d 1789 and 96 L.Ed. 263. He further points out that the efficacy of the doctrine of Surplus Trading has been seriously affected by the decisions subsequently rendered in *United States* v. *Detroit*, 355 U.S. 466 (1958); *United States* v. *Township of Muskegon*, 355 U.S. 484 (1958), and *Detroit* v. *Murray Corp.*, 355 U.S. 489 (1958). As we previously pointed out, this appeal does not involve any question properly related to the doctrine of federal tax immunity, but only involves a claim of lack of authority to levy taxes on property located outside the jurisdiction of the Commonwealth. Furthermore, in *United States* v. *Detroit, supra*, the Federal Supreme Court carefully pointed out that it was not a matter of taxation over federal property, but of the privilege to use a definite property for profitable purposes; we find the same situation in *Muskegon*; and in *Murray*, where tax exemption was claimed alleging that the property taxed belonged to the government. As may be seen

a question of jurisdiction to levy taxes was not involved, but even admitting that said cases were applicable, the facts are clearly distinguishable.

■ In a remarkable effort to support the action of appellant in levying the taxes challenged, it is alleged for the first time in this proceeding that the personal property on which the tax is levied, although "temporarily" located on the federal bases, has its permanent taxable situs in Puerto Rico. The difficulty lies in that we are precluded from exploring this aspect of the matter because the stipulation of facts on which the complaints were submitted makes no reference to such allegation. The briefs submitted by the parties to the trial court were limited to a discussion of the problem from the jurisdictional point of view, thereby corroborating that the question of the tax situs was not considered in submitting the controversy. Furthermore, this is a question which required the introduction of evidence to enable the court to make an adequate decision as to whether the personal property was temporarily or permanently located on said bases.[5] In relation to the taxable situs see

---

[5] It was alleged in the complaints that "petitioner has had during the tax years . . . and in the future expects to have a great amount of its construction equipment and possibly tools, accessories, and furniture in said base . . . *only* for the purpose of performing in said bases . . . works related to the national defense. . . ."

From an examination of the receipts showing the different tax assessments it appears that there was a continuous change in the equipment and machinery used in the execution of contracts, even allowing for annual depreciation.

*Capitol Construction Co.*

| Tax Year | Ramey Field | Roosevelt Roads |
|---|---|---|
| 1957–58 | $ 59,390 | $120,810 |
| 1958–59 | 218,500 | 108,220 |
| 1959–60 | 13,140 | 144,890 |
| 1960–61 | 2,510 | 162,780 |

*Blythe Co. of P.R. Inc.*

| | | |
|---|---|---|
| 1959–60 | $9,220 | $191,880 |
| 1960–61 | —— | 93,930 |

On the other hand, the appellee corporations point out as a significant

*Sucrs. de Abarca* v. *Sec. of the Treasury*, 80 P.R.R. 469 (1958); *Island Needlework, Inc.* v. *Tax Court*, 65 P.R.R. 685 (1946); cf. *Buscaglia, Treas.* v. *Tax Court*, 68 P.R.R. 839 (1948).

Since the errors assigned were not committed, the judgments rendered by the Superior Court, San Juan Part, on February 2, 1962 will be affirmed.

---

fact that the receipts were issued as corresponding to the municipality of Aguadilla, where Ramey Base is located, and Ceiba, headquarters of Roosevelt Roads Base. They elaborate the point that this shows that the Secretary attributed a permanent place to the property in the respective federal installations, for otherwise he would have included said equipment and machinery in the municipality where the taxpayers' warehouse is located. Although § 297 of the Political Code, 13 L.P.R.A. § 449, establishes the general rule that "All personal property within or without Puerto Rico shall be assessed to the owner thereof in the municipality in which he resides on the day of January first, except that such personal property . . . shall be assessed to the owner *in the municipality in which it is thus situated*; . . ." said provision refers to natural persons, but not to corporations. The sections applicable as to tax assessment on

corporations' personal property are § 317, related to 322, of said legal body, 13 L.P.R.A. §§ 464 and 468.