531 P.2d 212

UNITED STATES of America, the Zia Company, and Los Alamos Construc-
tors, Inc., Appellants,

v.

BUREAU OF REVENUE and Commissioner
of Revenue, State of New Mexi-
co, Appellees.

No. 1217.

Court of Appeals of New Mexico.

Jan. 8, 1975.

John F. McNett, Victor R. Ortega,
James B. Grant, T. B. Keleher, Keleher &
McLeod, Albuquerque, Scott P. Crampton,
Meyer Rothwacks, Bennet N. Hollander,
John J. McCarthy, Charles E. Stratton,
George F. Lynch, Crombie J. D. Garrett,
Washington, D. C., for appellants.

David L. Norvell, Atty. Gen., John C.
Cook, Sp. Asst. Atty. Gen., Santa Fe, for
appellees.

## OPINION

WOOD, Chief Judge.

The Bureau of Revenue issued tax as-
sessments against two United States Atom-
ic Energy Commission contractors—Zia
(The Zia Company) and LACI (Los Ala-
mos Constructors, Inc.). The assessments
were for the period January 1, 1966
through June 30, 1967. The taxes were as-

sessed under the Emergency School Tax Act and the Compensating Tax Act as those Acts were worded during the assessment period. The United States is a party because the contracts with Zia and LACI obligate the United States to provide funds necessary to defray all costs incurred in the performance of the contracts, including taxes. The United States, Zia and LACI protested the assessments. The Commissioner overruled the protests and held that the assessments were valid. The United States, Zia and LACI appeal directly to the Court under § 72–13–39, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1973). Various issues are raised but two are dispositive. They are: (1) liability for the emergency school tax under the "fixed fee" portion of the contracts; and (2) estoppel.

*Liability for Tax on the Fixed Fee*

The contracts provided that Zia and LACI were to receive a fixed fee for their services. The United States, Zia and LACI have conceded that the emergency school tax assessed on the basis of the fixed fee, together with interest, was due and owing.

*Estoppel*

Between 1947 and 1961 there were eight written opinions pertaining to liability for either school or compensating taxes in situations similar to the factual situation in this appeal. The opinions are variously signed—some were by the Commissioner of Revenue, some by attorneys for the Bureau of Revenue, and one by an Assistant Attorney General. The opinions are directed either to Zia, the Atomic Energy Commission or to the Director of the School Tax Division. The opinions are to the effect that neither school tax nor compensating tax would be owed under the facts of this case.

It is stipulated that: "The failure of Zia and LACI to pay any of the taxes assessed was pursuant to and in reliance on the . . . [written opinions]."

We agree with the Bureau that the estoppel provisions of § 72–13–73, N.M.S.A.

1953 (Repl.Vol. 10, pt. 2, Supp.1973) are not applicable. See Dona Ana Develop. Corp. v. Commissioner of Revenue, 84 N. M. 641, 506 P.2d 798 (Ct.App.1973). This, however, does not dispose of the estoppel issue.

The Tax Administration Act contains a savings clause. Laws 1965, ch. 248, § 79, reads:

"The Tax Administration Act does not apply to taxes the liability for payment of which was incurred prior to its effective date, or to any act done prior thereto. The payment, collection or enforcement of such taxes is to be accomplished according to the provisions of appropriate statutes previously in force and in every manner as though the Tax Administration Act had not been enacted."

■ The Tax Administration Act was effective on January 1, 1966. Laws 1965, ch. 248, § 78. Since the assessment was subsequent to the effective date, we have jurisdiction to review the validity of the assessment on direct appeal. Since the time period of the assessment was subsequent to the effective date, we are not concerned with the portion of the savings clause dealing with tax liability incurred prior to the effective date of the Tax Administration Act. See Transamerica Leasing Corp. v. Bureau of Revenue, 80 N.M. 48, 450 P.2d 934 (Ct.App.1969).

Our concern is with prior acts. The written opinions were acts done prior to the effective date of the Tax Administration Act. As we read the savings clause, the effect of those prior acts on the assessments in this case is to be determined on the basis of prior statutes and without regard to the estoppel provisions of § 72–13–73, supra.

The prior statute is § 72–16–47, N.M.S. A.1953 (Repl.Vol. 10, pt. 2). That act provides for an equitable estoppel against "the state, its officers, departments or divisions" upon a showing "that said taxes or any part thereof were not paid pursuant to a written rule or regulation of the school tax division of the bureau of revenue

. . . which rule or regulation shall have been, at the time of said action or suit, in effect for a period of not less than three [3] years . . . ."

■ This section is applicable if the written opinions can be considered "rules" of the School Tax Division of the Bureau of Revenue. "Rule" is not defined in § 72–16–47, supra. Section 72–13–23(B)(2), N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp. 1973) states:

"[R]ulings are written statements of the commissioner, of limited application to one or a small number of taxpayers, interpreting the statutes to which they relate, ordinarily issued in response to a request for clarification of the tax consequences of a specified set of circumstances."

The meaning of "rulings" in § 72–13–23(B)(2), supra, can be considered as the meaning of "rules" in § 72–16–47, supra. In addition, the legislative intent as to the meaning of "rules" can be taken from the preamble to § 72–16–47, supra. See Laws 1949, ch. 101, § 1. The preamble refers to taxpayers who "acted in good faith relying upon the *interpretation* placed upon said act in good faith by state officials . . . ." (Our emphasis.) On the basis of the legislative intent expressed in the preamble, the interpretations of state officials acting in good faith can be considered as the meaning of "rules" in § 72–16–47, supra. Compare State ex rel. Malone v. Crile, 34 N.M. 520, 284 P. 762 (1929). Under either of these approaches, we hold that the written opinions in this case were "rules" within the meaning of § 72–16–47, supra.

Excepting the liability for school tax on the "fixed fee," which has been conceded, we hold the Bureau is estopped from collecting the school taxes involved in this case.

Section 72–16–47, supra, applies only to school tax matters. There is no statute providing for estoppel against the State in compensating tax matters. Yet the facts for estoppel in connection with the compensating tax are as strong as the facts pertaining to the school tax. At least four of the written opinions state there is no liability for compensating tax.

■ We recognize that in the absence of a statute providing for estoppel, generally estoppel will not be applied against the State. See Ross v. Daniel, 53 N.M. 70, 201 P.2d 993 (1949). Yet two New Mexico decisions hold that estoppel should be applied "where right and justice demand it." Silver City Consol. Sch. Dist. No. 1 v. Board of Regents, 75 N.M. 106, 401 P.2d 95 (1965); City of Carlsbad v. Neal, 56 N.M. 465, 245 P.2d 384 (1952). The Bureau repeatedly assured the taxpayers that compensating tax was not to be paid and the taxpayers relied on that assurance. The Bureau's action in seeking to collect the compensating tax raises a question of an unconstitutional change in policy. See Rask v. Board of Bar Examiners, 75 N.M. 617, 409 P.2d 256 (1966); Compare State v. Clark, 79 N.M. 29, 439 P.2d 547 (1968).

The circumstances of this case are such that right and justice require that the Bureau be estopped to collect the compensating tax. We so hold.

We affirm the Commissioner's Decision and Order insofar as it upholds liability for school tax and interest on the "fixed fee" portion of the contracts. We reverse the remainder of the Decision and Order on the basis that the Commissioner erred in refusing to hold the Bureau was estopped to collect the remainder of the school tax and all of the compensating tax.

It is so ordered.

SUTIN, J., concurs.

HERNANDEZ, J., specially concurs.

HERNANDEZ, Judge (specially concurring).

I fully concur in Chief Judge Wood's opinion. However, I submit this special concurrence to show that, in my opinion, the Commissioner's assessment could have been reversed on other grounds as well.

The appellants raise three points of error which I consider to be well taken.

POINT I:

"UNITED STATES 'GOVERNMENT ADVANCED FUNDS' ARE NOT TAXABLE 'GROSS RECEIPTS' TO ZIA OR LACI, BECAUSE ZIA OR LACI NEVER 'RECEIVED' THOSE FUNDS NOR WERE GOVERNMENT ADVANCED FUNDS 'COMPENSATION FOR PERSONAL OR PROFESSIONAL SERVICES' TO ZIA OR LACI AS REQUIRED BY THE EMERGENCY SCHOOL (GROSS RECEIPTS) TAX ACT, SECTION 72-16-2(D), NEW MEXICO STATUTES, 1953, ANNOTATED (SUPP. 1965)."

POINT II:

"UNITED STATES GOVERNMENT ADVANCED FUNDS USED TO PURCHASE TANGIBLE PERSONAL PROPERTY ARE NOT 'GROSS RECEIPTS' TO ZIA OR LACI BECAUSE ZIA OR LACI MERELY ACTED AS PROCUREMENT AGENTS FOR THE GOVERNMENT."

The Bureau assessed ZIA and LACI on the amount of the funds advanced by the AEC alleging that they were "gross receipts."

Section 72-16-2(D), N.M.S.A.1953 (Repl. Vol. 10, pt. 2, 1965 Supp.) [being Laws 1963, ch. 208, § 1] provided in part:

"'Gross receipts' means the total sum . . . *received as compensation* for personal and professional services . . . the total receipts of a taxpayer derived from trades, business, commerce, and the gross proceeds of sales as hereinafter defined . . .." [Emphasis mine].

The key to an understanding of the statute is found in the meaning of the word "received." Were the funds advanced by Zia and LACI *received* by them as *compensation* for their services?

"The word 'received' appearing in the statute must be interpreted by giving the word its ordinary and general meaning, determined by the context and purpose to be accomplished by the enactment . . . [the 'advanced funds'] are . . . not assignable and have no loan value. This, therefore, is not just a device to escape tax liability while retaining for all intents and purposes full use of the funds. . . ." Trustees of Amherst College v. Comm'r. of Corps. and Taxation, 354 Mass. 503, 238 N.E.2d 351 (1968), and, " . . . constructive receipt of income . . . cannot be held to be equivalent of actual receipt, unless it can be seen that the taxpayer enjoys substantially the same material and objective benefits from the constructive receipt that he would enjoy if the income were paid directly to him or at least that he received some economic or tangible advantage therefrom." Comm'r. of Corps. and Taxation v. Williston, 315 Mass. 648, 54 N.E.2d 43 (1944).

In order to determine whether these funds were received by Zia and LACI as compensation for value received or services rendered we look to the contracts. These are unique documents, obviously drafted to meet a unique situation. It is apparent that neither the exact scope nor duration of the work to be performed could be known at the time the contracts were originally drafted. The monies deposited by the AEC into these special accounts are denominated "advanced funds" in the contracts. With these funds, Zia and LACI are required to make disbursements for all costs incurred by them in performing the contracts and in fulfilling their obligations under the annual work program as prescribed by the AEC. These advanced funds have always been Zia's and LACI's only source for meeting the financial requirements of performance under their contracts. Furthermore, neither Zia nor LACI has ever had the power to expend funds from the special accounts in any manner not dictated by the AEC. At

oral argument the United States answered the Commissioner's assertion that a decision to uphold these assessments is mandated under the terms of Article VI, paragraph 1, of the contracts: "Payment for allowable costs and of the fixed fee . . . shall constitute complete *compensation* for the contractor's services. . . ." [Emphasis mine]. From his reading of this paragraph, the Commissioner determined that "allowable costs" amounted in some sense to consideration paid for Zia's and LACI's performance, albeit that all allowable costs were disbursed from the advanced funds deposited by AEC to the special bank accounts. Suffice it to say that I understand the United States' characterization of the use of the term "compensation" in the above quoted paragraph as merely a limitation upon the government's liability under the contract; and do not consider the paragraph as supportive of the Commissioner's position.

My difficulty with the Commissioner's order and with the Bureau's position on appeal stems from my view that they have unreasonably isolated certain words and certain phrases in these contracts and in the statutes and have strained their meaning beyond ordinary or common usage in order to find that the funds advanced by the AEC were taxable "gross receipt." I acknowledge that some of these terms when isolated in a particular section or paragraph might carry the meaning contended by the Bureau. But it appears clearly that as used in § 72–16–2(D), supra, the word, "received," means "to take in." See Webster's Third New International Dictionary, Unabridged 1894 (3d Ed. 1971). Likewise, it is clear that the word "compensation" is used to mean "payment for value received or services rendered." Webster's Third New International Dictionary, supra. Thus, there is no question in my mind that the Commissioner was in error in attempting to construe the pertinent statute so as to apply it to the advanced funds deposited by the United States here.

Acknowledgment is also made of the result in the case of E. I. DuPont De Nemours & Co. v. State, 44 Wash.2d 339, 267 P.2d 667 (1954), in which the Supreme Court of Washington upheld an assessment against DuPont in circumstances almost exactly the same to those presented on this appeal. In my opinion, the Washington Court's refusal to abate the assessment against DuPont miscarries upon the same misconceptions of language as the argument urged upon us by the Bureau here. I would resist adoption of that manner of analysis as controlling in New Mexico. I believe that when read in context and in light of the working relationships of the parties, the words relied upon are not sustaining of the Commissioner's assessments. Some examples of the approach taken by the Bureau are given below.

In his brief the Commissioner cites the following from Article VIII of the contracts:

"All advances of Government funds shall be made by check payable to the Contractor and shall be deposited [sic] in the Special Bank Account referred to in [sic] Agreement for Special Bank Account, which is attached hereto and incorporated into this contract as Appendix C. The Contractor shall likewise deposit in the Special Bank Account *any other revenues received by the Contractor* in connection with the work under this contract." [Emphasis the Bureau's].

The Bureau then argues that:

"[T]he parties considered the advanced funds on deposit in the Special Bank Account to have been *received* by Zia and LACI because of the phrase requiring '. . . any other revenues received by the Contractor in connection with the work under this contract . . .' to be deposited in the Special Bank Account. If the advanced funds on deposit had not been received, then there was no need for the parties to refer to 'other revenues received' because no previous reve-

nues would have been received; the word 'other' could have been omitted."

I cannot agree. The "other revenues" referred to were obviously such things as refunds, or funds generated by activities supportive of, but incidental to, the main duties of the Contractors and conducted with the advanced funds. I believe the word "received" in this context only means taking custodial delivery or possession of government funds.

The Bureau also quotes the following from Article VIII of the contract:

"It is understood that an advance to the Contractor hereunder *is not a loan to the Contractor,* and will not require the payment of interest by the Contractor, and that the Contractor acquire no right, title, or interest in or to such advance *other than the right to make expenditures therefrom* as provided in this article." [Emphasis the Bureau's].

The Bureau then argues that the right to make expenditures from the advanced funds indicates that Zia and LACI had received these funds; and that, therefore, they were part of their "gross receipts," and that the funds were intended to be the property of Zia and LACI. Again, I disagree. To arrive at this conclusion the Bureau has to ignore the words, "and that the Contractor acquire no right, title, or interest in or to such advance."

The Bureau quotes from the Special Bank Account Agreement which provides that the amounts advanced to the contractor shall be kept " . . . separate from any of the Contractor's general and [sic] other funds . . ." [Emphasis the Bureau's], and couples it with the following from Article VIII: "The unliquidated balance of the Special Bank Account may be applied to the *amount due and any balance shall be returned to the Government forthwith.*" [Emphasis the Bureau's]. They then argue:

"The implication is that the phrase 'amount due' refers to amounts due the contractor. A stronger implication that the funds in the account had been received by Zia and LACI is found in the

phrase requiring that the ' . . . balance shall be returned to the Government forthwith.' If the funds in the Special Bank Account were not intended by the parties to be received by Zia or LACI, then there would be no necessity for them to be *returned* to the government."

I would respond that, "[t]he thought behind the phrase proclaims itself misread if the outcome is absurd." In this situation the intent of the parties proclaims itself misread if we were to conclude that the many millions of dollars in advanced funds were compensation within the meaning of the Act, supra.

Our Supreme Court in Schultz & Lindsay Construction Co. v. State, 83 N.M. 534, 494 P.2d 612 (1972) stated: "The contract must be considered and construed as a whole, with meaning and significance given to each part in its proper context with all other parts, so as to ascertain the intention of the parties." It is my opinion that the advanced funds were not received by Zia and LACI as compensation for services rendered; and, therefore, they were not "gross receipts" as defined by Section 72–16–2(D), supra. See Westland Corporation v. Commissioner of Revenue, 83 N.M. 29, 487 P.2d 1099 (Ct.App.1971), cert. denied July 21, 1971.

POINT III:

"NO COMPENSATING TAX IS DUE FROM ZIA OR LACI SINCE THE NEW MEXICO COMPENSATING OR USE TAX ACT, SECTION 72–17–2, PROVIDES THAT 'USE' SHALL BE 'INCIDENT TO THE OWNERSHIP OF THAT PROPERTY,' AND AT ALL TIMES OWNERSHIP OF THE TANGIBLE PERSONAL PROPERTY HERE INVOLVED WAS IN THE UNITED STATES AND NOT IN ZIA OR LACI."

Section 72–17–3, N.M.S.A.1953 (Repl. Vol. 10, pt. 2) [being Laws 1957, ch. 227, § 4] provided in part:

"An excise tax is hereby imposed on the storage, use of other consumption in this

state of tangible personal property purchased from a retailer. . . . . . [p]rovided, however, that a receipt from a retailer . . . authorized . . . to collect the tax imposed hereby . . . shall be sufficient to relieve the purchaser from further liability for the tax to which such receipt may refer." Section 72–17–2(b), N.M.S.A.1953 (Repl. Vol. 10, pt. 2) [being Laws 1941 Comp., § 76–1502] provided:

" 'Use' means and includes the exercise of any right or power over tangible personal property incident to the ownership of that property, except that it shall not include the sale of that property in the regular course of business."

The tax imposed by this statute is levied on the privilege of storage, use or other consumption of tangible personal property by an owner-purchaser. The parties stipulated that during the period in question all purchases of tangible personal property were made by Zia (some of which were made available to LACI) with funds advanced by the AEC. The title to all of this property passed directly from the vendor to the United States. Since the United States Government was exempt, no tax was due. Section 72–17–4, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, 1965 Supp.) [being Laws 1965, ch. 68, § 1 and Laws 1966, ch. 59, § 2]. "[S]torage, use or other consumption in this state of the following tangible personal property is specifically exempted . . ., [B.] . . . by the United States government . . . ."

The United States District Court for the District of Nevada in the case of United States v. Nevada Tax Commission, 291 F. Supp. 530 (D.C.Nev.1968), analyzing an almost identical statute and factual situation had this to say:

"The admitted facts conclusively establish that the United States is the owner of the property used by Reeco [the Government contractor] against which the use tax was assessed. The United States is the 'person' storing, using or otherwise consuming the property in this state [Ci-

tation omitted]. The Nevada statute taxes only uses by an owner-purchaser. The use in Nevada of this property owned by the United States is exempt from taxation under the Nevada law."

The Nevada Act defines use as follows: " '[u]se' includes the exercise of any right or power over tangible personal property incident to the ownership of that property . . . ." United States v. Nevada Tax Commission, supra. I would hold that neither Zia nor LACI may be assessed by the Bureau for their contractually required use, storage or consumption of property belonging to the United States.