[No. 110-40830-2.    Division 2.    July 22, 1970.]

BOISE CASCADE CORPORATION, *Appellant*, v. THE STATE OF WASHINGTON, *Respondent*.

*Eberle & Berlin, T. H. Eberle, Graham, Dunn, Johnston & Rosenquist, Ben J. Gantt, Jr.,* and *Jack G. Strother,* for appellant.

*Slade Gorton, Attorney General,* and *Timothy R. Malone, Assistant,* for respondent.

PEARSON, J.—This is an appeal by Boise Cascade Corporation from a judgment dismissing with prejudice its appeal from a ruling of the State Tax Commission.[1] The case was tried before the court, sitting without a jury, upon oral testimony, depositions, exhibits and stipulated evidence.

In its brief, Boise Cascade has challenged certain findings of fact entered by the trial court. On oral argument, however, its challenge was limited to the ultimate finding expressed in finding No. 13. In any event, our review of the testimony reveals that the other portions of the findings challenged by appellant are supported by substantial evidence, and consequently binding upon this court. Accordingly, in setting out the factual background of this appeal, we will repeat with some omissions and some modifications, as indicated, the findings of the trial court:

## II

The Tax Commission of the State of Washington, through its representatives, conducted an audit of the records of Boise Cascade [and its predecessors]. This audit covered the period December 1, 1957, through August 31, 1960. As a result of this audit, a tax assessment . . . dated October 2, 1961, was served upon Boise Cascade. After due protest, the Tax Commission, upon hearing, by order of November 22, 1961, affirmed the audit in part and denied relief. In this litigation, Boise Cascade seeks a refund of part of the payments made pursuant to this assessment, other parts of the payments not being in dispute. The refund claimed is wholly for tax for a sale at retail on an amount of construction cost of the Wallula Paper and Pulp Mill attributable to payroll.[2]

---

[1] We have no record of the proceedings before the State Tax Commission.

[2] It is established that if the tax is payable on the labor payroll, Boise Cascade will be liable for the amount due. *Murray v. State,* 62 Wn.2d 619, 384 P.2d 337 (1963).

## III

The issue in this case arises out of the construction of a building and the installation of certain equipment, both of which are a part of a major industrial installation for the manufacturing of pulp and paper and adjacent converting facilities, together with transportation, office and other facilities, all located at Wallula, Washington. . . .

The construction involved in this litigation does not include considerable work performed outside of the mill structure. . . .

## IV

Swinerton & Walberg Company (hereinafter referred to as "S & W") and Engineers Limited Mechanical Construction Company (hereinafter referred to as "ELMCO") entered into an agreement with Boise Cascade, dated March 20, 1958 (hereinafter referred to as "Agreement"), [Exhibit A] with respect to the construction of much of the pulp and paper mill at Wallula, Washington. Both S & W and ELMCO were limited partnerships, with home offices in San Francisco, California. . . .

## V

Prior to the signing of this agreement, S & W had extensive background as a general contractor, including background in paper mill construction, and had done some professional engineering and architectural work. ELMCO, which is affiliated with S & W, acted as S & W's mechanical arm, i.e., performed the mechanical work, such as piping, etc., for construction projects in which S & W was involved.

## VI

At the time of entering into the contract with S & W and ELMCO, Boise Cascade was already engaged in obtaining the construction of parts of the Wallula complex, . . . Having by the end of 1957 decided to construct the pulp plant, in the early part of 1958, the central engineering department of Boise Cascade, augmented by an outside architectural firm, placed orders for structural steel and ordered long lead time delivery items such as the paper machine and the recovery boiler. To cut planning and construction time to a minimum and to take advantage of the unique knowledge of certain of its personnel of construction of small pulp mills, Boise Cascade determined it should proceed without detailed

plans, and that it should keep close control of the execution of the project, including giving Boise Cascade the right to approve and direct purchasing to best serve its material supply business, to closely regulate cash flow as construction proceeded, to prepare and amend plans from time to time, and to control size and priority of assignment of the labor force.

## VII

Before entering into the contract with S & W and ELMCO, Boise Cascade gave serious consideration to building the Wallula pulp mill wholly with its own forces by expanding executive, professional, office and management personnel and adding construction crews to its own payroll directly. However, Boise Cascade decided to enter into the Agreement with S & W and ELMCO. Under paragraph 6 of the Agreement, Boise Cascade exercised its right to have S & W and ELMCO arrange for all labor necessary for the project. This decision was made because of a number of reasons. These were that Boise Cascade, upon completion of the plant, desired to join the West Coast paper industry bargaining association, which would require it to have no other unions except one of two paper workers' unions as bargaining agent for all of the employees. It desired to avoid more than one bargaining unit within its plant, which might result in building unions such as the carpenters', pipefitters', etc., claiming the maintenance workers. In addition, while Boise Cascade had its own labor relations department, dealing with a number of unions at other locations, it had no experience in dealing with industrial building trade unions. Also, such trade unions in the tri-city area had acquired the reputation of being rather militant. In accordance with the basic policy decision noted, Boise Cascade did not enter into union contracts with the various industrial building trade unions. S & W and ELMCO had previously entered into international or national agreements with these unions, and the labor force was hired in accordance with these agreements.

## VIII

In the operation of the job, O. W. Hisey was Director of Boise Cascade's Central Engineering division and was the chief executive and representative of Boise Cascade for the execution of the project, with Keith Miller of Central Engineering as Chief Engineer under him. Cen-

tral Engineering tried to keep ahead of the job site work in preparation of detailed plans, and gave oral directions if plans were not timely available. Central Engineering consisted of an office at Walla Walla with a number of people in it, including some draftsmen of S & W. At the job site [were] Boise Cascade employee Ray Milbach as Project Engineer, and S & W personnel Jim Wade as Structural Superintendent and Cal Harling as Mechanical Superintendent, both of said latter men carrying union cards. Mr. Jerry Warner of S & W was the home office liaison man who visited the job regularly and acted generally between Boise Cascade and S & W. Directions from Boise Cascade to S & W and ELMCO were given in a chain from Hisey to Miller to Milbach, and then to the S & W or ELMCO supervisors on the job.

## IX

Boise Cascade reserved under the Agreement, and exercised the controls so reserved, to determine the size and composition of the labor force, to control overtime, and to direct any priority in relation to the crews' work. Nevertheless, day to day labor supervision was usually under the two named S & W employees, except when on occasion Mr. Hisey and/or Mr. Miller were on the job and ordered at regular shifts, or in special emergencies, certain work to be directly performed by the crews. The hiring was done directly by Mr. Wade and Mr. Harling or the foremen under them. No attempt was made by anyone—either Boise Cascade, ELMCO or S & W—to convey to the membership of the said building trade unions or to the union representatives the proposition that Boise Cascade, rather than S & W and ELMCO, was the actual employer. Labor representatives dealt with S & W and ELMCO personnel in handling labor problems, rather than with Boise Cascade personnel. Work assignments, *i.e.*, the determination of which union was to do which work, was made by S & W or ELMCO personnel, not Boise Cascade.

## X

At the commencement of the Agreement, Boise Cascade established two bank accounts, one in the local Seattle First National Bank branch and one in the Kennewick Branch of the National Bank of Commerce. Both accounts were in the name of Swinerton & Walberg as agent. The actual payroll checks were issued against the

National Bank of Commerce and were signed by S & W personnel, with no marking indicating agency. The checks paying withholdings of federal income tax, social security tax, and for the employer's unemployment compensation and social security amounts were issued against the Seattle First National Bank, signed by S & W personnel, specifically marked "Agent". Amounts due on reports to the Washington State Department of Labor and Industries and to the Washington State Department of Employment Security were paid from this latter account. All funds placed in either of said bank accounts were supplied by Boise Cascade and not S & W or ELMCO, and were placed in said accounts by Boise Cascade to meet the costs as S & W notified Boise Cascade of their amounts. As required by the Agreement, S & W made the reports for withholding of federal income tax, federal social security tax, state industrial insurance tax and employment compensation tax.

## XI

During work on the project, the purchase of all materials except in amounts under $500, and the issuance of all subcontracts, were made under the name of S & W as agent for Boise Cascade Corporation. Prior approval in each case for either the purchase or the contract was obtained from Boise Cascade. Payments were made by the checks from the Seattle First National Bank, signed by S & W personnel, and designated "Agent". Boise Cascade received and approved transmittals of all items, received daily job diaries from its personnel and S & W personnel, received all purchase orders and sub-contracts for approval, and continually reconciled both bank accounts. In a number of instances Boise Cascade directly purchased materials, and it purchased all major items of equipment to be supplied and installed on the job. All personnel on the job, except Central Engineering personnel, were paid as a part of the cost of the job. Jerry Warner was furnished as a part of S & W's general services, and his salary was included in the $50,000 fixed fee paid to S & W and ELMCO.

## XII

Neither S & W nor ELMCO had any equipment at the construction site, nor had any investment in any way in the project. However, certain equipment was rented from Engineers Limited, a related but not subsidiary company

to S & W and ELMCO. Included in the $50,000 fixed fee were services to be performed by S & W by the office in San Francisco, which included both professional services of engineering and architecture functions, as well as certain bookkeeping functions.

## XIII

Boise Cascade exercised control over the construction to the extent that it performed the functions of engineering and architectural designer and inspector, and to the extent that it exercised the controls of an owner normal in a "cost plus" construction contract. Within the limits of these controls, S & W and ELMCO performed normal functions of a general contractor.

The main thrust of Boise Cascade's challenge to the ultimate fact finding expressed in No. 13, is that the facts affirmatively establish that the amount of control it exercised was substantially more than normally reserved by an owner in a construction contract, and that S & W[3] acted as Boise Cascade's agent, rather than as a general or independent contractor.

In setting forth the issue and contentions before us, it is necessary to recite relevant provisions of the applicable taxing statute. RCW 82.04.050 defines a retail sale as follows:

> The term "sale at retail" or "retail sale" shall include the sale of or charge made for tangible personal property consumed and/or for labor and services rendered in respect to the following: . . . (b) the constructing, repairing, decorating, or improving of new or existing buildings or other structures under, upon, or above real property of or for consumers, including the installing or attaching of any article of tangible personal property therein or thereto, . . .

The above definition is limited by RCW 82.04.360, which provides:

> This chapter shall not apply to any person in respect to his employment in the capacity of an employee or servant as distinguished from that of an independent contractor.

---

[3] S & W will be used to refer to Swinerton & Walberg *and* Engineers Limited Mechanical Construction Company, unless otherwise stated.

Two subsections of RCW 82.08.010 are also relevant. RCW 82.08.010(1) provides as follows:

"Selling price" means the consideration, whether money, credits, rights, or other property, expressed in the terms of money paid or delivered by a buyer to a seller, . . .

RCW 82.08.010(2) defines "seller" as follows:

"Seller" means every person making sales at retail or retail sales to a buyer or consumer, whether as agent, broker, or principal; . . .

Boise Cascade asserts that the workmen arranged for by its agent, S & W, were servants and employees of Boise Cascade. Consequently, according to the provisions of RCW 82.04.360, the charge made for their services was not a retail sale and not taxable. To establish S & W's agency status, Boise Cascade points out that S & W was expressly designated as its agent in arranging for labor, issuing sub-contracts and purchasing materials. Such an agency relationship can make a difference for tax purposes as shown by the case of *Du Pont de Nemours & Co. v. State*, 44 Wn.2d 339, 267 P.2d 667 (1954).

The state, also relying on *Du Pont*, contends that S & W was an independent contractor and a "seller"[4] under the law and that the payroll amounts are taxable. The state argues that the laborers on the S & W payroll were employees of S & W rather than of Boise Cascade.

■ Initially, we state that the designation of S & W as "agent" in the contract is not sufficient to establish the existence of that relationship. *United States v. Livingston*, 179 F. Supp. 9, (E.D.S.C. 1959), *aff'd.*, 364 U.S. 281, 4 L. Ed. 2d 1719, 80 S. Ct. 1611 (1960). Also, the fact that some

---

[4] The use of the word "agent" in RCW 82.08.010(2) defining "seller" is not determinative in this case. The statute, we believe, classifies one who *sells* as the agent of another as a seller, but the statute does not establish that one acting as a buyer's agent is a seller.

Rule 105 (revised 1954) of the Rules Relating to Revenue Act of 1935 states in part: "A corporation, joint venture, or any group of individuals acting as a unit, is not an employee or servant." This portion of Rule 105 does not meet Boise Cascade's argument that S & W acted as its agent.

portions of a contractor's activities may meet the test of true agency status does not establish that other activities in connection with the same project were performed as an agent. *See* discussion of *Du Pont de Nemours & Co. v. State, infra.* Thus, our only concern in this case is to determine whether S & W acted as an agent regarding the employment of workmen for the mill project.

In *Du Pont,* the state levied against the Du Pont company for business and occupation taxes in connection with its work and services at the Hanford Engineer Works in eastern Washington. The levy was made against all reimbursements Du Pont received for labor and materials under its cost-plus-fixed-fee contract with the federal government. The fixed fee provided for in the contract was 1 dollar. Under the contract, the government retained substantial control over the activities of Du Pont. The government provided the facilities and money, and it undertook all the risks incident to the project. Pointing to the features of the contract, Du Pont argued that it was an agent for the government, that the tax was actually extracted from the federal government, and that the tax was, therefore, in violation of the supremacy clause of the United States Constitution, article 6, section 2.

In one portion of the contract, Du Pont was expressly designated as agent for the purpose of collecting rentals on certain government-owned buildings at the project. The court assumed that such an agency agreement was sufficient to remove tax liability for Du Pont on the rental amounts. However, "In no other respect was Du Pont expressly designated an agent, or given the status of an agent to enter into contracts for the government, or to pledge the government's credit." *Du Pont,* 44 Wn.2d at 349. The court held that unless the contractor was *designated* and *treated* as an agent, neither the fact that the government reserved and exercised control over the general activities of Du Pont nor the other unique features of the contract established an agency relationship. Since Du Pont was not an agent, it was

held to be an independent contractor and the amounts paid for labor and materials were taxable.

In addition to *Du Pont,* Boise Cascade has cited to us a number of tort and contract cases in which the agency relationship was distinguished from that of independent contractor. In one such case, *Turnbull v. Shelton,* 47 Wn.2d 70, 286 P.2d 676 (1955), the Supreme Court defined an independent contractor as one who does something for another under a contract and who is not controlled by the other in the performance, but only as to the result of the contractual duties. An agent, however, is controlled by the principal as to his conduct of the matter entrusted to him.

We think *Turnbull* and the other cases cited by Boise Cascade are not in point in this case. It is apparent from *Du Pont* that a different test is applied to the agency concept in tax cases than in tort or contract cases. In *Du Pont,* the federal government formulated the policies and programs to be carried out. All the work and services performed were subject in all respects to the approval of a government contract officer. The government established or approved all practices and safety regulations to be employed in the project and it also had the right to require dismissal of certain employees. Under the facts and law of the traditional agency concepts relied upon by Boise Cascade, it is clear that Du Pont would have been an agent of the government, due to the substantial controls retained over its performance of the contract duties.[5] However, as we stated above, Du Pont was held to be an agent only insofar as it was a collection agent for rents from government buildings.

There are some United States Supreme Court decisions which are helpful in determining whether there is an agency status for tax purposes. *United States v. Boyd,* 378

[5]For (an excellent) analysis of the employee-independent contractor distinction in the tort field, *see Hollingbery v. Dunn,* 68 Wn.2d 75, 411 P.2d 431 (1966). *Also see Stewart v. Hammond,* 78 W.D.2d 209, 471 P.2d 90, which holds that the common law concept of "independent contractor" is not applicable to the "contractor registration statute," RCW 18.27 *et seq.,* because that statute contains a specific statutory definition of "independent contractor."

U.S. 39, 12 L. Ed. 2d 713, 84 S. Ct. 1518 (1964) involved an agreement by two corporations to operate an atomic energy facility. The cost-plus-fixed-fee agreement was very similar to the one in *Du Pont*. The United States Supreme Court held that state use taxes could be levied on government-owned property used by cost-plus contractors in operating and performing construction at government plants. The court, in so holding, rejected arguments that the government-owned property was used for the sole benefit of the government and that the contractors were so controlled by the government as to become its servants in agency terms. The court reasoned that the companies had a substantial stake in the enterprise maintaining sizable work forces and receiving substantial fees. The companies had entered the contracts with commercial and profit-making considerations in mind, and whatever limitations there were on the contractors' risks derived from the very nature of the cost-plus-fixed-fee contracts. The Supreme Court also emphasized that the companies' employees brought both skill and judgment needed by the government, and that there was substantial room for the exercise of both. The government voluntarily chose not to build and operate the plant with its own employees as it might have. The court stated at 378 U.S. 39, 48: "We cannot conclude that Carbide and Ferguson, both cost-plus contractors for profit, have been so incorporated into the government structure as to become instrumentalities of the United States . . ."

In another United States Supreme Court opinion, *Kern-Limerick, Inc. v. Scurlock*, 347 U.S. 110, 98 L. Ed. 546, 74 S. Ct. 403 (1954), it was held that a state sales tax could not be levied on purchases of property by a private contractor authorized to make such purchases for the government because the incidence of the tax was upon the government.

The cost-plus contractor could make purchases of supplies only if a government officer gave prior approval to each request for bids and to each purchase. Both the requests for bids and the purchase orders clearly disclosed that the government was the purchaser and that the pur-

chasing agent incurred no liability to the seller from the transaction. In view of the facts, the contractor was held to be an agent of the government to enter into contracts and to pledge its credit. In the *Kern-Limerick* opinion the Supreme Court distinguished another decision involving *similar facts, Alabama v. King & Boozer*, 314 U.S. 1, 86 L. Ed. 3, 62 S. Ct. 43, 140 A.L.R. 615 (1941). In that opinion the court stated at 314 U.S. 11 that the contract between the parties plainly contemplated

> that the contractors were to purchase in their own names and on their own credit all the materials required, unless the Government should elect to furnish them; that the Government was not to be bound by their purchase contracts, but was obligated only to reimburse the contractors when the materials purchased should be delivered, inspected and accepted at the site.

Further, the court stated at page 13:

> But however extensively the Government may have reserved the right to restrict or control the action of the contractors in other respects, neither the reservation nor the exercise of that power gave to the contractors the status of agents of the Government to enter into contracts or to pledge its credit.

S & W, like the contractors in *Boyd,* had commercial and profit-making considerations in mind when it contracted with Boise Cascade. For example, S & W expected to gain experience and entry into the Northwest construction market in addition to the fee it would receive from the project. Although S & W, like the other cost-plus contractors under consideration in the cases reviewed above, undertook few entrepreneurial risks, it did have a financial stake in proper completion of the project in order to earn its fee. S & W was also entitled to a share of savings under the "agreed construction estimate" for the project.[6] Its fee was to be reduced by the amount that charges for rental of construction equipment exceeded a specified amount.[7]

---

[6]Memorandum Agreement (Exhibit A), paragraph 3.

[7]Memorandum Agreement (Exhibit A), paragraph 4(c).

S & W brought to the project skilled workmen and management personnel. And, despite the controls exercised by Boise Cascade, there was "substantial room" in the daily supervision and execution of the work for S & W to exercise its skill and judgment.

Boise Cascade could have built the mill with its own employees, but it chose not to do so. Instead, Boise Cascade contracted with S & W to avoid direct contact with building and construction labor unions and to avoid other problems incidental to the administration of the labor force. The payrolls, federal withholding tax payments, social security payments, unemployment compensation premiums, and state industrial insurance premiums were administered, prepared and reported by S & W. Under these circumstances, we do not believe that S & W was "so assimilated [into Boise Cascade] as to become one of its constituent parts." *United States v. Boyd,* 378 U.S. 39, 47, 12 L. Ed. 2d 713, 84 S. Ct. 1518 (1964).

We think the trial court should be affirmed. The findings of fact support the ultimate finding and conclusion that S & W was an independent contractor, and that the labor force was employed by S & W, rather than Boise Cascade. *See North Pac. Coast Freight Bureau v. State,* 12 Wn.2d 563, 122 P.2d 467 (1942). Accordingly, the payroll amounts were properly taxable as a charge made for labor and services in constructing buildings. (RCW 82.04.050.)

If Boise Cascade had taken on the responsibilities of dealing with the building and construction labor unions, and if the workers had known that they were directly accountable to and paid by Boise Cascade, there would be more support for Boise Cascade's position. In such circumstances, S & W would be "assimilated" into Boise Cascade, so as to be one of its "constituent parts," charged with providing personnel with the requisite skills for employment and direct supervision by Boise Cascade. *United States v. Boyd, supra.*

Both Boise Cascade and the state have employed in their

arguments certain of the Rules Relating to Revenue Act of 1935.

These rules were promulgated by the Tax Commission of the state of Washington, as authorized by RCW 82.32.300. The rules cited are rules No. 105, 111, 138, 170 and 223.

Rule 105 pertains to distinguishing "employees" from "persons engaging in business." *See* RCW 82.04.360, *supra.* Boise Cascade argues that S & W was not engaging in business as a prime contractor because it had no "liability for losses," bore none of "the expenses of conducting a business" and did not act "in an independent capacity." We have previously pointed out how a cost-plus contractor can bear the risks and expenses of conducting business. We have also outlined how, in our opinion, S & W acted in an independent capacity, having "employees subject to [its] control and supervision." Rule 105 (revised 1954) of Rules Relating to Revenue Act of 1935.

Rule 111 deals with "advances and reimbursements." The rule excepts advances and reimbursements from taxation and defines the terms to apply only "when the taxpayer . . . has no personal liability . . . other than as agent for the customer or client." Boise Cascade argues that the labor payroll amounts were advances or reimbursements, and S & W had no liability whatsoever. However, the rule also provides that its terms do not apply to "services to be rendered by the taxpayer or upon goods to be purchased by the taxpayer in carrying on the business in which the taxpayer engages." We think that S & W was held out as the employer of the labor forces, and that S & W rendered services incident to the business in which it was engaged.

The other rules cited appear to raise issues previously addressed in this opinion.

Judgment affirmed.

ARMSTRONG, C. J., and PETRIE, J., concur.

Petition for rehearing denied September 8, 1970.

Review denied by Supreme Court October 1, 1970.