[No. 1103-2.    Division Two.    April 29, 1974.]

CONVERSIONS AND SURVEYS, INC., *et al., Appellants,* v. THE
DEPARTMENT OF REVENUE, *Respondent.*

*Cartano, Botzer & Chapman* and *Robert A. O'Neill,* for appellants.

*Slade Gorton, Attorney General,* and *Timothy R. Malone, Senior Assistant,* and *William D. Dexter, Assistant,* for respondent.

PETRIE, J.—A foreign corporation admitted to do business in the state of Washington, having ceased to do business within this state, sought permission to formally withdraw from the state. As a prerequisite to withdrawal, the corporation filed an affidavit with the Tax Commission of the State of Washington, requesting the commission to certify to the Secretary of State of the State of Washington that the corporation had fully satisfied all tax liability imposed upon it by the Revenue Act of 1935 as amended. The

affidavit was filed with the Tax Commission on June 5, 1959, and the certificate was issued by the Tax Commission's successor, the Department of Revenue, on September 8, 1971. This is the saga of the intervening 12 years.

Upon receipt of the affidavit, the commission conducted a reaudit of the taxpayer's account. Some 17 months later the commission's field auditor, having completed the audit, submitted interoffice correspondence to his chief which, in retrospect, concluded with an ironically prophetic remark. After noting an intradepartmental difference of opinion as to the extent of the taxpayer's responsibilities under the law, and after noting particularly, the difference of opinion between the taxpayer's chief tax manager and the auditor's final field report, the auditor concluded, "so I suppose this matter will go on and on and on."

On December 13, 1960, the commission forwarded to the taxpayer a document entitled "TAX ASSESSMENT" which purported to be "(Final)" for the audit period June 1, 1956 to September 30, 1960. The document declared, "Total Due and Hereby Assessed . . . . . $54,360.88" and bore the admonition, "A penalty of 10% will be assessed if not paid on or before January 13, 1961." Accompanying the document was a letter of transmittal, also dated December 13, 1960, which advised the taxpayer that upon payment of the tax an appropriate certificate would be forwarded to the Secretary of State.

Shortly before the issuance of this final tax assessment, attorneys for the taxpayer had attended a conference with personnel of the commission at which the taxpayer's tax liability had been discussed. After the attorneys had been advised of the commission's action of December 13, 1960, they wrote a letter to the commission dated January 4, 1961, which recited, in part:

> If the December 13th letter constitutes a determination of the matters discussed in that conference may we now respectfully request a Hearing before the Commission thereon and, further, request an extension of the January 13th, 1961 penalty date for a reasonable period for disposition.

In reply thereto, the commission advised the taxpayer's counsel on January 25, 1971, that the commission's action of December 13 did not constitute a determination of matters discussed on December 7. The reply added, however:

We are not setting a hearing date pending consideration of points raised at the December 7th conference and in the meantime, *the assessment has been placed in abeyance.*

(Italics ours.)

On or about the same date, the commission's Interpretation and Review Section sent an internal memo to its Collection Division, entitled "Abeyance Notice" with the request: "Please place above assessment in abeyance pending I & R processing of protest."

In May 1961, in response to an inquiry from the taxpayer's representative, the commission replied: "A hearing is to be held concerning the audit within the next two weeks." In response to a second inquiry, the commission advised in September 1961, that a question of a credit remained to be considered which "should be resolved shortly and the firm will be notified of the commission's decision." A third inquiry in June 1962, elicited no more enlightening response.

For over 8 years thereafter (about 10 years since the assessment had been issued) the matter lay absolutely dormant.

In September 1970, in response to an inquiry from the taxpayer's counsel to the Department of Revenue (which by then had become successor to the Tax Commission), a conference was set for November 20, 1970. As a result of that conference the department requested still further information from the taxpayer. The taxpayer responded by letter dated December 2, 1970, submitted the newly requested information, but also advised: "Some of our key people who handled the changeover operation have left the Company."[1]

---

[1]The additional tax assessment arose out of work which Conversions and Surveys, Inc., had performed under contract with Washington

The department considered the matter further and 8 months after receipt of the additional information and without ever having set a hearing date (which had been promised more than 10 years before),[2] issued its "FINAL DETERMINATION" on August 18, 1971, demanding payment of the tax in the same amount as had been determined years ago. The taxpayer paid the tax under protest on September 1, 1971, and, pursuant to RCW 82.32.180, filed a notice of appeal to the Superior Court for Thurston County seeking a refund. Issue was joined when the department filed its answer and counterclaim,[3] and the taxpayer replied thereto.

Thereafter, both parties filed affidavits in support of their respective positions and the deposition of the former executive vice president of Conversions and Surveys, Inc. (C & S) was taken and published. Based upon the pleadings, affidavits and deposition, both parties moved for summary judgment. The trial court denied the taxpayer's motion and granted the department's motion. The taxpayer has appealed to this court.

The taxpayer's contentions are: (1) it never had any tax liability in the first place, or at least, a fact issue remains to be resolved which would be determinative of that issue; and (2) even if a tax liability initially existed, the department should be enjoined from enforcing any tax assessment because (a) the assessment for additional tax was made "more than four years after the close of the tax year," in contravention of RCW 82.32.050, and (b) the unreasonable administrative delay has denied the taxpayer due process of law and equal protection under the law.

The department's contentions are: (1) the record estab-

---

Natural Gas Company, when that company converted its distribution system from manufactured gas to natural gas in 1956.

[2]In the intervening time period the statutory requirement of a hearing was replaced by a requirement of a conference only. *See* RCW 82.32.160.

[3]The counterclaim sought interest and penalties from December 1960 until September 1971 when the taxes were finally paid, but the counterclaim has subsequently been withdrawn.

lishes the taxpayer's liability as a matter of law; and (2) the department should not be enjoined from enforcing the assessment because (a) it was made within the 4-year period required by RCW 82.32.050 and (b) the admittedly unreasonable delay in processing the taxpayer's request for review did not deprive the taxpayer of due process or equal protection of law, at least not to the extent that the taxpayer suffered any prejudice.

We find no difficulty in affirming the trial court's determination that the record establishes, as a matter of law, that the work which C & S performed in the state of Washington in 1956 generated a tax liability, under the Revenue Act of 1935 as amended, in the amount set forth in the assessment notice of December 13, 1960.

The tax consequences, if any, flow from circumstances created when Washington Natural Gas Company (WNG) converted approximately 48,000 of its customers to a higher BTU gas in 1956. At that time, WNG contracted with C & S, a subsidiary of Stone and Webster Service Corporation, to plan, organize, supervise and direct the conversion operation. In an introductory paragraph of the contract, C & S agreed to act

> as your employee and agent in connection with the conversion of all gas burning equipment served by your distribution system, it being understood that in providing and performing such services we will be subject always to your direction and control.

Then followed the contractual details of how the conversion would actually be effected.

The department contends the services C & S performed actually constituted a "sale at retail" as defined by RCW 82.04.050 and therefore those services were subject to the state retail sales tax.

The tax liability issue, under substantially similar circumstances, has been covered extensively in a recent opinion of this court. *Boise Cascade Corp. v. State*, 3 Wn. App. 78, 473 P.2d 429 (1970). We see no reason to unduly pro-

tract this opinion by detailing the multitude of facts, as gleaned from the record, and as viewed in the light most favorable to the taxpayer, which support our conclusion. Viewed in that light, any objective analysis of the entire record simply does not support a conclusion that the work unit of C & S which performed the conversion operation was so assimilated into WNG as to become one of its constituent parts.[4] Accordingly, we must conclude, as did the trial court, that the work performed by C & S in 1956, constituted a "sale at retail" as defined in the Revenue Act of this state.

Therefore, the issue of initial tax liability should have been removed from the case by entry of a partial summary judgment to that effect.

■ We turn then to the taxpayer's contention that collection of the tax should be enjoined (actually that a refund should be granted) as a matter of law because the assessment for additional tax due did not become final until more than 4 years had elapsed after the close of the tax year. At the time the final assessment was initially submitted to the taxpayer (December 13, 1960), the nonclaim statute (RCW 82.32.050) provided, in part:

If, upon examination of any returns or from other information obtained by the tax commission it appears that a tax or penalty has been paid less than that properly due, the commission shall assess against the

[4]One distinction between the facts in *Boise Cascade Corp. v. State,* 3 Wn. App. 78, 473 P.2d 429 (1970), and the facts in the case at bench is worthy of comment. In the case at bench, WNG reported workman hours for C & S's workmen to the Department of Labor and Industries on WNG's report for workmen's compensation coverage and remitted premiums for such hourly work based upon WNG's earned premium rate, whereas, in *Boise Cascade,* the workmen's compensation coverage was administered, prepared and reported by the contractor who performed the work for Boise Cascade Corporation. This fact, if standing alone, would tend to support the taxpayer's contention that C & S's employees were assimilated into WNG. However, this one distinction is not determinative of the overall issue, particularly when the record affirmatively shows that had C & S reported the workman hours in its own name and under its own account the total premium would have been more than 3.5 times greater than the premium actually paid.

taxpayer such additional amount found to be due . . . The commission shall notify the taxpayer by mail of *the additional amount* and the same *shall become due* and shall be paid *within ten days* from the date of the notice, *or within such further time as the commission may provide.* . . .

*No assessment* or correction of an assessment for additional taxes due *may be made* by the commission more than *four years after the close of the tax year,* except [exceptions not applicable].

(Italics ours.) Laws of 1951, 1st Ex. Sess., ch. 9, § 5, p. 20.

The statute obviously requires that the assessment must be "made" within 4 years of the tax year, but provides that, to avoid a penalty for delinquent payment, the tax need only be paid within 10 days of the date of the notice of the assessment or "within such further time as the commission may provide." By necessary implication, therefore, the commission had authority to hold collection of the tax in abeyance once assessment has been made within the appropriate 4-year period. That is precisely what the commission did by its letter of January 25, 1961, in response to the taxpayer's counsel's letter of January 4, 1961.

The taxpayer's contention, in reality however, is that the commission literally held the assessment in abeyance, not merely its collection. Counsel's letter of January 4, 1961, reasonably directed the commission's attention to the fact that the taxpayer protested the commission's action and therefore desired a hearing before the commission. Accordingly, the letter triggered the commission's review authority. *See Nelson v. Department of Labor & Indus.,* 9 Wn.2d 621, 115 P.2d 1014 (1941). At the time it placed the assessment in abeyance, the commission's authority to review, subsequently codified as RCW 82.32.160, provided in part:

Any person having been issued a notice of additional taxes, delinquent taxes, interest or penalties assessed by the Tax Commission under the provisions of this act, may within twenty days after the issuance of the original notice of the amount thereof *petition* the Tax Commission in writing *for a hearing and correction of the*

*amount of such assessment.* The petition shall set forth the reasons why such hearing should be granted and the amount of the tax, interest or penalties, which the petitioner believes to be due. *The Tax Commission shall promptly grant such hearing* and shall fix the time and place therefor and notify the petitioner thereof by mail. *If no such petition be filed* within such twenty day period *the assessment* covered by such notice *shall become final.*

(Italics ours.) Laws of 1939, ch. 225, § 29, p. 1013.

Thus, in 1961, the overall statutory plan for assessment and collection of these taxes provided (1) the assessment must have been made within 4 years and (2) the assessment became final within 20 days after issuance unless the taxpayer petitioned for an administrative hearing. As soon as the taxpayer filed a petition for review, however, the *finality* of the assessment was stayed and certain affirmative duties were imposed upon the commission. Those duties included: a duty to promptly grant an administrative hearing on the issue presented by the petition; a duty to conduct that hearing; a duty to act upon completion of the hearing process; and a duty to set a time in which the tax would become due and payable.

The reasonable interpretation of the department's letter of January 25, 1961, is simply that the collection of the tax was held in abeyance, not that the process of making the assessment had been somehow suspended.

Accordingly, we agree with the trial court, that the assessment was made within the 4-year period provided by RCW 82.32.050. That issue, also should have been eliminated from this case by entry of a partial summary judgment to that effect.

We turn, finally, to examination of how reasonably or unreasonably the commission performed its other duties under the statutory scheme, and the effect, if any, upon the taxpayer by reason of that performance.

In the trial court and in this court, the taxpayer has verbalized its theory that delay prejudiced the taxpayer by denying it certain constitutional rights to which it is enti-

tled. Analysis of these constitutional rights in light of the factual circumstances existing herein would most certainly provide an interesting topic for judicial rumination. For an enlightening recent discussion of the overall problem *see* S. Goldman, *Administrative Delay and Judicial Relief,* 66 Mich. L. Rev. 1423 (1967-68). However, we do not deem it necessary, and therefore decline, to reach the constitutional issues presented.

From the facts available in the record it appears that the taxpayer's real theory, although not specifically verbalized as such, is that the department is estopped, at this late date, from attempting to collect the additional tax which had been assessed in 1960. The doctrine of equitable estoppel may be applied against the state, even when it is acting in its governmental capacity, when necessary to prevent a manifest injustice and the exercise of governmental powers will not thereby be impaired. *Shafer v. State,* 83 Wn.2d 618, 521 P.2d 736 (1974); *State ex rel. Shannon v. Sponburgh,* 66 Wn.2d 135, 401 P.2d 635 (1965). Furthermore, the taxpayer is not precluded from asserting this specific theory in view of all the circumstances. *Thoma v. C.J. Montag & Sons, Inc.,* 54 Wn.2d 20, 337 P.2d 1052 (1959).

The facts in the case at bench do not require a conclusion, as a matter of law, that the state is estopped from collecting the assessment at this late date. Accordingly, the trial court properly denied the taxpayer's motion for summary judgment. However, there are sufficient facts, well pleaded and already in the record (but also subject to further elaboration), which would permit, as an arguable position (1) that the state has previously acted (nonacted) in a manner inconsistent with the claim which it presently asserts; (2) the taxpayer had a right to, and reasonably did, rely upon the state's nonaction; and (3) the taxpayer has been injured by reason thereof.

The taxpayer, knowing of the internal conflict among several members of the staff of the former Tax Commis-

sion, and being advised after repeated attempts to ascertain the status of the matter that a hearing would be set shortly, may well have assumed that the conflict had been resolved in its favor. The nonaction of the commission (department) for almost 10 years is reasonably, if indeed not conclusively, subject to that conclusion. The commission, not the taxpayer, had the affirmative duty to set the matter for hearing. The bald assertion that key personnel had left the taxpayer's employ is insufficient as a matter of law to establish that the taxpayer could no longer, in 1971, effectively assert its nonliability for the tax which had been assessed in 1960. Indeed, any inferences deriving from the fact of loss of personnel must be resolved against the taxpayer, the moving party in the motion for summary judgment. However, the taxpayer should not be precluded from attempting to establish the fact of injury at a trial of the matter.

If, at trial, the taxpayer can establish these facts, it will have sustained its burden of proof that the state should have been estopped from collecting the tax in 1971. *Shafer v. State, supra; Strand v. State,* 16 Wn.2d 107, 132 P.2d 1011 (1943).

Insofar as the judgment dismissed the taxpayer's action, it is reversed. The matter is remanded for trial on the issues not specifically excluded by reason of this opinion.

PEARSON, C.J., and ARMSTRONG, J., concur.

Petition for rehearing denied June 3, 1974.

Review denied by Supreme Court September 25, 1974.