[No. 55569-9. En Banc. October 31, 1989.]

RHO COMPANY, INC., *Respondent,* v. THE DEPARTMENT OF REVENUE, *Petitioner.*

562

*Kenneth O. Eikenberry, Attorney General,* and *Mary E. Fairhurst, Assistant,* for petitioner.

*Joseph D. Holmes, Jr.,* and *Philip A. Talmadge* (of *Karr, Tuttle, Campbell*), for respondent.

DURHAM, J.—Rho Company, Inc. (Rho) contends that WAC 458–20–111—which excludes certain "pass through" payments from gross income for purposes of business and occupation taxes—applies to its business, which supplied temporary engineering personnel to client companies. Rho regularly received payments from its clients that it then

passed on to the temporary personnel as wages, per diem and repayment of travel expenses. The Board of Tax Appeals (Board) found the regulation inapplicable to Rho, and included these payments in determining the taxpayer's gross income. In so ruling, the Board relied exclusively on provisions found in the contracts underlying Rho's transactions. We reverse. We hold that the contractual labeling of the parties' relationships, although an important factor, is not solely determinative of the regulation's applicability.

# I
## FACTS

Rho is a Washington corporation which supplies local manufacturing and engineering firms with temporary workers having technical engineering skills. Rho conducts most of its Washington business[1] by providing personnel for the Boeing Company, but Rho also conducts business with Westinghouse Hanford Company, Crown Zellerbach and Western Gear Machinery Corporation.

According to all of Rho's contracts—including both those entered into with the technical personnel and those with its corporate clients—the contract personnel were employed by Rho. These contracts repeatedly state not only that Rho employed the contract personnel, but also that Rho acted as an independent contractor in dealing with the corporate clients. Although most of the contracts were silent as to the creation of an agency relationship between Rho and the clients, at least one of the contracts expressly disavowed the existence of any such relationship.

Under these contracts, the corporate clients did not directly compensate the contract personnel, but instead they sent money to Rho, who then assumed responsibility as an employer for paying the personnel, paying employer taxes, and for withholding the appropriate amount of the employees' paycheck for tax purposes. Labeling the workers

---

[1] Rho also engages in business in California and other western states.

as Rho's employees was an essential part of the service that Rho provided.

By establishing Rho as the employer of the temporary workers, the clients were able "to avoid costs and liabilities attendant to hiring technical personnel as their own employees."

When one of Rho's clients had a temporary need for engineers, the client provided Rho with a purchase order listing the number of workers needed and basic job qualifications. Rho checked its resume bank for suitable personnel, and if none seemed to match the client's requirements, it advertised in various newspapers. Rho then forwarded suitable resumes to the client, who decided which workers would receive offers. The client contacted Rho with offers of employment at a given salary, and Rho communicated this information to the workers. The worker either accepted the offer or countered with a higher proposed salary. In this manner, with Rho acting as intermediary, the worker and the client arrived at a final agreement as to salary, and if the worker did not live in the immediate area, the negotiations would also cover the possible payment of a per diem amount and reimbursement of relocation expenses.

Once the worker reported to the client's work facility, he was subject to the exclusive guidance of the client. The client determined the worker's job assignment and the duration of his employment. The client supervised the worker and evaluated his performance. Rho played no role in this supervision, and the only regular contact that Rho had with the workers once they were on the job was the mailing of paychecks. The client furnished the tools and materials for the contract personnel to use. Requests for raises were submitted to the client either by Rho or by the worker directly. The client decided when to terminate a worker, and the procedures called for Rho to inform a worker of his firing once the client so decided. In practice, however, the client often informed the worker that he was fired without going through Rho.

Rho billed the clients based on each worker's hourly wage and hours worked. Rho then paid the workers' wages and any applicable per diem and travel expenses. Rho also withheld the appropriate taxes from the workers' wages and was responsible for reporting and paying withholding, FICA, FUTA and unemployment insurance contributions to the appropriate governmental agencies. The amount that Rho collected from the client as its own profit and payment of overhead expenses was calculated either as a fixed amount per employee or as a fixed percentage of the worker's salary.

The Department of Revenue (Department) assessed Rho's tax liability for the years 1979 through 1983 at $657,940. Rho contended that WAC 458–20–111 (Rule 111), by excluding the reimbursements it received for paying the workers' wages, travel and per diem, reduced its liability to only $142,461. Alternatively, Rho argued that it should have been assessed the lower rate established for "processors for hire", which would have reduced its liability to $270,087.

The Board agreed with the Department's position that because Rho's contracts showed that it was not acting as an agent in employing the workers, Rule 111 was not applicable. The Board also concluded, without further explanation, that Rho had not presented sufficient evidence to establish that it was taxable as a processor for hire. The Board's decision was affirmed on appeal to the King County Superior Court.

The Court of Appeals reversed the decisions below. *Rho Co. v. Department of Rev.*, 52 Wn. App. 196, 758 P.2d 553 (1988). The court determined that the Board committed an error of law[2] when it "confined its inquiry to the form of

---

[2]As the Court of Appeals indicated, appellate review of this case is controlled by Washington's administrative procedure act, RCW 34.04:

The standard of review for a formal hearing before the Board is governed by RCW 34.04.130. *UPS, Inc. v. Department of Rev.*, 102 Wn.2d 355, 687 P.2d 186 (1984). *The standard is error of law* and under this standard the reviewing court may substitute its judgment for that of the administrative body, though

the transaction and not its substance." *Rho,* at 207. The court stated that proper resolution of the issues required going beyond the contracts to determine which party actually employed the contract personnel. In this regard, the court decided that the record was inadequate for it to decide the employment question, and it remanded for further fact–finding on the question of the right of control over the contract personnel. *Rho,* at 206–07. Finally, the court held that the Board's dismissal of Rho's "processor for hire" argument was arbitrary and capricious, and remanded for further consideration of this issue. *Rho,* at 207. This court granted the Department's petition for review.

## II
### APPLICABILITY OF RULE 111

B&O taxes are assessed at different rates depending on the type of business the taxpayer conducts. The statutes categorize a number of different business activities and specify the tax rate to be applied to each. The Department determined in this case that Rho fit within the "catch–all" category of "other business or service activities", for which the tax rate currently is 1.5 percent of the gross income generated by the business. *See* RCW 82.04.290.

Because the tax is based on gross income rather than net income, a business is taxed on the entire gain it accrues from its transactions, and no deduction is allowed for the expenses involved in conducting the business. RCW 82.04-.080. Therefore, as a general rule, the base amount from

---

substantial weight is accorded the agency's view of law. *UPS, Inc. v. Department of Rev., supra; Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 646 P.2d 113 (1982), *cert. denied,* 459 U.S. 1106 (1983). Agency findings of fact will be reviewed under the clearly erroneous standard, *Hitchcock v. Department of Retirement Sys.,* 39 Wn. App. 67, 71, 692 P.2d 834 (1984), *review denied,* 103 Wn.2d 1025 (1985), or under the arbitrary and capricious standard. *Northern Pac. Transp. Co. v. State Utils. & Transp. Comm'n,* 69 Wn.2d 472, 418 P.2d 735 (1966).

(Italics ours.) *Rho,* at 201.

which the B&O tax is calculated does not allow for deductions for the expenses of conducting business.

Even though business expenses generally are not deductible, the Department has adopted an administrative rule recognizing that certain "pass through" expenses should not be included in determining gross income. Rule 111 excludes from the definition of "gross income" certain "advances" and "reimbursements" for which the taxpayer assumes solely agent liability.

Rule 111 reads as follows, with the heart of the rule being stated in the fourth paragraph:

> The word "advance" as used herein, means money or credits received by a taxpayer from a customer or client with which the taxpayer is to pay costs or fees for the customer or client.
>
> The word "reimbursement" as used herein, means money or credits received from a customer or client to repay the taxpayer for money or credits expended by the taxpayer in payment of costs or fees for the client.
>
> *The words "advance" and "reimbursement" apply only when the customer or client alone is liable for the payment of the fees or costs and when the taxpayer making the payment has no personal liability therefor, either primarily or secondarily, other than as agent for the customer or client.*
>
> *There may be excluded from the measure of tax amounts representing money or credit received by a taxpayer as reimbursement of an advance in accordance with the regular and usual custom of his business or profession.*
>
> The foregoing is limited to cases wherein the taxpayer, as an incident to the business, undertakes, on behalf of the customer, guest or client, the payment of money, either upon an obligation owing by the customer, guest or client to a third person, or in procuring a service for the customer, guest or client which the taxpayer does not or cannot render and for which no liability attaches to the taxpayer. It does not apply to cases where the customer, guest or client makes advances to the taxpayer upon services to be rendered by the taxpayer or upon goods to be purchased by the taxpayer in carrying on the business in which the taxpayer engages.

(Italics ours.) WAC 458–20–111.

■ This court has summarized the operation of Rule 111 by stating that the rule allows an exclusion from income for a "pass through" payment when the following three conditions are met: (1) the payments are "customary

reimbursements for advances made to procure a service for the client"; (2) the payments "involve services that the taxpayer did not or could not render"; and (3) the taxpayer "is not liable for paying the associate firms except as the *agent* of the client." *Christensen, O'Connor, Garrison & Havelka v. Department of Rev.*, 97 Wn.2d 764, 769, 649 P.2d 839 (1982); *see Walthew, Warner, Keefe, Arron, Costello & Thompson v. Department of Rev.*, 103 Wn.2d 183, 186, 691 P.2d 559 (1984).

There is no dispute as to the applicability of the first two conditions. The clients customarily paid Rho for procuring the engineering services rendered by the technical personnel, and Rho did not itself perform these services. The facts described above clearly reveal that Rho itself did not supervise or otherwise become involved in the rendering of the engineering services. Indeed, it appears from oral argument that Rho was not even licensed to render such services. On appeal, the parties have focused solely on the third condition—whether Rho's liability for paying the technical personnel is solely that of an agent.

The third condition has been addressed in two of this court's recent opinions. Because the facts of each of these cases differs from those of the present case, however, they provide limited help in resolving our issue. In *Christensen,* the taxpayer was a law firm which had advanced money to out–of–state attorneys and foreign patent professionals for services performed for the law firm's clients. In that case, however, both parties stipulated that the service providers understood that they were working directly for the law firm's clients and, consequently, the taxpayer had no liability for paying the providers, rendering applicable Rule 111. *Christensen,* at 769–70. *Walthew* involved similar facts, in that a law firm had advanced money to court reporters, process servers and physicians on behalf of its clients. The court held that because rules on attorney discipline prevent attorneys from advancing the costs of litigation for the client unless the client remains ultimately liable for those

costs, the law firm was liable only as an agent of its client. *Walthew,* at 188.

In the present case, the third condition is not so easily analyzed as it was in *Christensen* and *Walthew,* there being no stipulation between the parties as to ultimate liability and no rules preventing Rho from assuming liability for paying the contract personnel. Accordingly, we turn to the rules of agency for guidance.

The question that the parties have primarily addressed in this regard is: Who employed the contract personnel, Rho or Rho's corporate clients? If Rho is the employer, then Rho is liable in its own right for the payment, and Rule 111 does not apply. If, however, the clients are deemed to be employers, then Rho is more easily characterized as the clients' paymaster agent in paying the personnel.

Because the contracts show that Rho employed the personnel, the Department argues that Rho was primarily liable—not just as an agent—for paying the workers. Rho, on the other hand, argues that the clients actually employed the personnel, and Rho's payment of the personnel was actually an advance or reimbursement for which Rho was liable only as the clients' agent. According to Rho, the Department's exclusive reliance on the contracts improperly exalts form over substance. The Court of Appeals adopted this form versus substance analysis. *Rho,* at 203, 206, 207.

While there is support for this approach in the law, the extent to which a taxpayer is allowed to invoke the doctrine is far from settled.[3] Furthermore, the parties have not

---

[3]The party invoking the doctrine is usually not the taxpayer but the taxing authority. In such instances, courts generally are willing to elevate substance over form. *See* B. Bittker, *Federal Taxation of Income, Estates and Gifts* ¶ 4.3.3, at 4–36 (1981). Courts disagree, however, on the extent to which taxpayers should be allowed to invoke this doctrine. Some courts state that taxpayers can never invoke the doctrine, reasoning that taxpayers should be bound by the form that they chose for their transactions. Other courts hold that the doctrine can be freely invoked by either the taxpayer or the taxing authority. *See* B. Bittker, at ¶ 4.3.6. Finally, some courts take a middle position and allow taxpayers to invoke the

thoroughly addressed this issue. Fortunately, this case can be resolved without resorting to substance/form analysis. Rho's argument that the contractual labels are not determinative has merit under well–accepted principles of agency.

 Determination of an agency relationship is not controlled by the manner in which the parties contractually describe their relationship. *See Matsumura v. Eilert,* 74 Wn.2d 362, 368, 444 P.2d 806 (1968); *Busk v. Hoard,* 65 Wn.2d 126, 134, 396 P.2d 171 (1964); *see generally* 3 Am. Jur. 2d *Agency* § 21, at 526 n.36 (1986). An agency relationship generally arises when two parties consent that one shall act under the control of the other. *See Uni–Com Northwest, Ltd. v. Argus Pub'g Co.,* 47 Wn. App. 787, 737 P.2d 304, *review denied,* 108 Wn.2d 1032 (1987). The requisite consent need not be expressed between the parties, but can be implied from their actions:

> An agency relationship, of course, may arise without an express understanding between the principal and agent that it be created. It does not depend upon an express undertaking between them that the relationship exists. *Petersen v. Turnbull,* 68 Wn.2d 231, 412 P.2d 349 (1966). If, under the circumstances, the parties by their conduct have created an agency in fact, then it exists in law.

*Matsumura,* at 368.

In this regard, agency is a legal concept that depends on the manifest conduct of the parties; it "does not depend upon the intent of the parties to create it, nor their belief that they have done so. . . . [A]n agency exists although the parties did not call it agency and did not intend the legal consequences of the relation to follow." Restatement (Second) of Agency § 1, comment *b* (1958), *quoted in Busk v. Hoard, supra* at 129. It follows that an agency can be implied, if the facts so warrant, not only if the contracts are silent as to agency, but even if the parties execute contracts expressly disavowing the creation of an agency relationship.

doctrine only if the taxpayers can satisfy an elevated standard of proof. *See* B. Bittker, at ¶ 4.3.6.

*See Fernander v. Thigpen,* 278 S.C. 140, 143, 293 S.E.2d 424 (1982).

Therefore, although it reasoned differently, the Court of Appeals correctly concluded that the Board committed an error of law by restricting its analysis to the parties' contracts. We remand to the Board for consideration of the parties' relationship which takes into account the factors we discuss in this opinion, one such factor being the contractual labeling of the parties' relationship.

On remand, the Board will have to determine whether Rho acted as the clients' agent in paying the technical personnel, and if so, whether Rho's liability to the personnel was *solely* that of an agent.[4]

This first issue involves application of traditional agency principles. The Board will have to decide whether Rho and its clients consented—either expressly or impliedly—that Rho would act under the clients' control. Along these lines, we disagree with the overly broad language from a Court of Appeals opinion stating that "a different test is applied to the agency concept in tax cases than in tort or contract cases." *Boise Cascade Corp. v. State,* 3 Wn. App. 78, 87, 473 P.2d 429 (1970). In *Boise Cascade,* the Court of Appeals concluded that in tax cases, courts must look not just at the issues of consent and control, but also to (1) whether the parties' contracts actually designate one party as the agent of the other, and (2) whether one party has become so "assimilated" or "incorporated" into the other party's structure as to become its "instrumentality" or one of its "constituent parts". *Boise Cascade,* at 88, 90.

These extra requirements in *Boise Cascade* are not applicable to agency issues in the context of Rule 111 cases. *Boise Cascade*'s support for these extra requirements comes only from cases addressing whether the federal government's immunity from state taxation should be extended to

---

[4]The dissenting opinion is based on the premise that we hold that Rho is not liable on its contracts with its engineers. To the contrary, we are remanding for a determination of the nature of Rho's liability on these contracts.

private contractors of the federal government. *See E.I. Du Pont de Nemours & Co. v. State*, 44 Wn.2d 339, 267 P.2d 667 (1954); *see also Kern–Limerick, Inc. v. Scurlock*, 347 U.S. 110, 98 L. Ed. 546, 74 S. Ct. 403 (1954); *United States v. Boyd*, 378 U.S. 39, 12 L. Ed. 2d 713, 84 S. Ct. 1518 (1964). The analysis of constitutional tax immunity in these older cases combined analysis of the agency factors of consent and control with nonagency factors, such as the extent to which one party was assimilated into the other's structure. A recent Supreme Court case has recognized as much and stated that "a finding of constitutional tax immunity requires something more than the invocation of traditional agency notions: to resist the State's taxing power, a private taxpayer must actually 'stand in the Government's shoes.'" *United States v. New Mexico*, 455 U.S. 720, 736, 71 L. Ed. 2d 580, 102 S. Ct. 1373 (1982) (*quoting Detroit v. Murray Corp. of Am.*, 355 U.S. 489, 503, 2 L. Ed. 2d 441, 78 S. Ct. 458 (1958)). Therefore, these cases should not be interpreted as adding additional requirements to the definition of "agent" in tax cases involving different issues.[5]

Moreover, in *Christensen* and *Walthew*, which dealt with law firm/client relations, agency was found under Rule 111 even though there was no indication that a contract expressly established an agency relationship and even though neither law firm was so incorporated into their clients' structure as to be one of their constituent parts.

---

[5]Nothing in *Seattle v. Paschen Contractors, Inc.*, 111 Wn.2d 54, 758 P.2d 975 (1988) should be interpreted to the contrary. Although we used a general cite to *E.I. Du Pont de Nemours & Co. v. State*, 44 Wn.2d 339, 267 P.2d 667 (1954) in support of our holding that the transaction did not constitute a "pass through" payment, the case should not be interpreted as expanding the definition of "agent" for purposes of Rule 111. The holding of *Paschen Contractors* turns on the conclusion that the money actually belonged to the contractor rather than passing through to the State, and the citation to *E.I. Du Pont de Nemours & Co. v. State, supra*, merely provided general support because of its somewhat similar facts.

Accordingly, we hold that the standard definition of agency should be used in analyzing Rule 111, absent any specific legislative or regulatory statement to the contrary.[6]

If an agency relationship is found on remand, then the Board will also have to determine if Rho's obligation to pay the technical personnel constituted *solely* agent liability. Resolution of this issue will require analysis of the control over the contract personnel that was exercised by Rho and by the clients. If the clients' control over the personnel was so pervasive that it should be deemed the employers of the personnel for purposes of B&O taxation, and Rho's control consisted of little more than paying the personnel once they were hired, then Rho should be deemed to be a mere paymaster who pays the personnel only as an agent for the clients. The areas in which control will be important will include hiring, compensation, work assignment, supervision and termination.

And finally, as our previous discussion makes clear, the Board will have to look beyond the contractual labels placed on the parties' relationships in determining these issues.

## III
### "PROCESSOR FOR HIRE" CLASSIFICATION

Rho presented an alternative argument to the Board. Its position was that if the Board ruled against it as to the applicability of Rule 111, then it should be taxed not as a service provider but as a processor for hire. *See* RCW 82.04.280; WAC 458–20–136.

█ The Court of Appeals held that the Board's handling of this issue was arbitrary and capricious. *Rho Co. v.*

---

[6]We note that Washington's tax regulations have placed additional restrictions on the definition of "agent" at least for one category of taxpayers. Taxpayers who buy or sell tangible personal property on behalf of another will not be treated as agents unless they have a contract expressly creating an agency relationship and their records indicate that the transactions were entered into in the name of the principal. WAC 458–20–159. This regulation, however, is expressly limited to cases involving tangible personal property and therefore is not applicable to the current case involving personal services.

*Department of Rev.*, 52 Wn. App. 196, 207, 758 P.2d 553 (1988). In its petition for review, the Department challenges this conclusion by arguing that Rho waived this issue by not presenting evidence on this issue to the Board and by not arguing it until its closing statement. We decline to address this argument because the Department has presented no argument or authority to support its position. *See Transamerica Ins. Group v. United Pac. Ins. Co.*, 92 Wn.2d 21, 29, 593 P.2d 156 (1979).

The case is remanded to the Board of Tax Appeals for further proceedings consistent with this opinion.

CALLOW, C.J., and BRACHTENBACH, DOLLIVER, PEARSON, ANDERSEN, and SMITH, JJ., concur.

DORE, J. (dissenting)—I dissent.

No one should mistake the fact that the majority has inflicted a catastrophic loss of revenue on the State. The wider implications of this decision should be recognized, if only as a measure of how wrong the decision is. First, although it directly concerns only the business and occupation (B&O) tax, this case necessarily will have an enormous impact on the calculation of the state sales tax. Since the B&O and retail sales tax statutes share a number of key definitions, many sales of services fall under the category of "retail sales" for B&O and sales tax purposes. By removing this sale of services from the B&O tax rolls, the majority's opinion threatens to remove many other sales of services from the retail sales tax rolls as well. Second, the majority's reasoning offers a generous opportunity to evade B&O taxation to those taxpayers willing and able to restructure their business relations into agencies—not a very difficult task for most.

These implications are all the more disturbing given the fact that the majority's reasoning is clearly flawed. Rho is not the agent of its customers; it is a seller of services. Its contracts refer to it as a seller and never as an agent. It provides the services pursuant to "purchase orders". Rho

provides its services by means of its own employees; it does not merely retain third parties on behalf of its customers. Rho's compensation is a function of the hours of service provided, not a proportion of the proceeds of the transaction. Even if Rho were an agent, however, that would not resolve this case. The cost of its engineers' salaries is a cost to Rho of doing business regardless of whether Rho is an agent, because Rho's status as an agent would not excuse it from liability to those engineers in the first instance. Consequently, the engineers' salaries must be included in gross income for B&O tax purposes.

### The Effect on Revenues

The majority's decision allows a taxpayer to treat a sale of services as something other than what it is, and thus to escape the bulk of its tax liability. I doubt that the implications of that decision will escape the notice of other sellers of services for long. They will soon reorganize their transactions to take advantage of the opportunities the majority has extended. The majority should recognize the full implications of its decision.

There are a large number of services which are treated as "retail sales" for both B&O and sales tax purposes. *See* RCW 82.04.050; WAC 458–20–141; 458–20–149; 458–20–152; 458–20–156; 458–20–170; 458–20–172; 458–20–173. This is due to the fact that, under RCW 82.08.010(4), certain key definitions from RCW 82.04, the chapter on B&O taxes, are incorporated into the chapter on sales taxes, RCW 82.08. Specifically, the definition of a "retail sale" is the same for both systems.

If a transaction falls outside the definition of a retail sale for B&O tax purposes, it will be taxed at a lower B&O tax rate. *See* 2 Wash. Tax Dec. 87–76, at 391 (1987). More importantly, however, the shared definition of "retail sale" means that the transaction will also fall outside the scope of the retail sales tax. Since the majority's opinion permits a taxpayer to treat a sale of services as a nontaxable transaction between an agent and a principal, it removes many

sales of services not only from the B&O tax, but also from the retail sales tax. A simple example will indicate the scope of the revenue loss at stake.

Suppose a plumber is hired by a homeowner for a job worth $100. The transaction is taxable under the B&O tax as a retail sale and under the retail sales tax. WAC 458–20–170. The B&O taxes amount to .495 percent of the gross proceeds of the sale, or about 50 cents. RCW 82.04.250; 82.04.2904(1). Retail sales tax due would be 7.15 percent of the sales price, or $7.15. RCW 82.08.020; 82.04.2904(2). The total revenue collected would be approximately $7.65.

Now suppose that the homeowner contacted a company similar to Rho, which employed plumbers itself and contracted with homeowners to provide plumbers who would work directly for the homeowner, at the homeowner's direction, just as if the homeowner had hired the plumbers himself. Under the majority's reasoning, this plumbing company would be the agent of the homeowner. Most of the $100 payment would pass through to the plumber himself, and the company would retain only a small commission, say $10. The $90 received by the plumber would not be taxable, since he is an employee. WAC 458–20–105. Only the $10 would now be taxable under the B&O tax and sales tax. The State would receive revenue of about 77 cents. Under the majority's reasoning, a slight alteration in business organization results in a loss of $6.88 in revenue on this one small transaction.

Not all service transactions fall under both the B&O and the sales tax systems. Sales of services like Rho's fall under the provision for "business or service activities," which imposes a tax of 1.50 percent on the gross income of the business. RCW 82.04.290. Even here, however, the majority's reasoning will encourage businesses to reorganize their operations into agency relationships, with a consequent reduction in tax revenues.

Suppose, for example, that Company A's employees B, C and so on provide services to Company Z which brings $100

to Company A. Company A pays its employees' salaries equivalent to 90 percent of its gross. If, like Rho, Company A falls under RCW 82.04.290, it will pay $1.50 in B&O tax on the transaction with Company Z. Suppose, however, that Company A writes its contracts so as to act as Company Z's "agent" with regard to A's employees in the same transaction. Under the majority's reasoning, Company A's gross income is now only $10, and the State will receive 15 cents in revenue. The net loss in revenue is $1.35.

The lost revenue in these examples may not seem like much, but we are dealing here with a tax calculated on the gross proceeds generated by every service transaction conducted in this state. The $100 of my example represents hundreds of millions of dollars of business revenue in the real world. The revenue loss the majority inflicts on the State today is huge and totally unjustifiable.

### Rho Is Not an Agent

The majority remands for a determination on whether Rho was the agent of its customers. As shown below, answering that question will not resolve this case. All of the confusion on those points could be avoided, however, if the majority would frankly acknowledge that Rho is a seller of services, and not an agent at all.

A major part of the service Rho provided was to bear the expense of recruiting and interviewing engineers. In doing so, Rho sought to find engineers who would meet the needs of its customers, but this does not mean that Rho was the agent of those customers in this recruiting process. Rho collected a pool of qualified engineers, from which its customers could make a selection. If Rho did not find the right engineer for the job, however, a customer was under no obligation to the engineer or to Rho. The customer could seek out engineers elsewhere. If, on the other hand, Rho did find an engineer which met its customer's requirements, the engineer was not hired by the customer; he was placed on Rho's payroll. Rho sought out qualified engineers which

would meet the needs of its customers, and that was a service to those customers. It does not follow, however, that Rho was an agent in such instances.

There is an administrative rule which sets out a clear standard for distinguishing between sellers and agents, WAC 458–20–159 (Rule 159), and we should apply it to this case. The majority contends, without argument, that the rule is inapplicable here because it deals with sales of tangible personal property rather than sales of services. Majority, at 573 footnote 6. On the contrary, however, there is every reason to use Rule 159 here. First, the same logic which supports treating certain sellers of goods as agents, and therefore free of tax liability, applies equally to a seller of services.[7] Second, the B&O system as a whole does not make a consistent distinction between sellers of goods and sellers of services. As noted above, the B&O tax system treats a number of services as retail sales, subject to the same rates as retail sales of goods. Third, and most importantly, Rule 159 states a simple, commonsense standard for weeding out exactly the sort of after–the–fact claim of agency status that we are presented with here.

Rule 159 sets forth two requirements for a taxpayer's being treated as an agent not subject to taxation:

> (1) The books and records of the broker or agent show the transactions were made in the name and for the account of the principal, and show the name of the actual owner of the property for whom the sale was made, or the actual buyer for whom the purchase was made.
> (2) The books and records show the amount of gross sales, the amount of commissions and any other incidental income derived by the broker or agent from such sales.

WAC 458–20–159. We have a substantial record before us, with what is clearly an adequate sample of Rho's business records. When examined in light of Rule 159, the only possible conclusion one can draw from these records is that Rho is a seller of engineering and drafting services.

---

[7]As discussed below, this turns on the fact that they are not liable and so have not incurred a cost of doing business.

Rho's records simply were not kept in the manner required by the rule to establish agency status. I cannot find a single instance in Rho's records where the terms agent and principal are used to refer to Rho and its customer. On the contrary, Rho and its customers are consistently referred to as "Seller" and "Buyer". The plain language of these transactions indicates that Rho was a seller of services, and we should treat it as one. Anything else gives undue credit to an ingenious but untrue after-the-fact characterization of this relationship.

Rho's contracts with its customers describe the subject of the transaction as "the furnishing of said personnel to Buyer by Seller" and "the use of Seller's employees." Clerk's Papers, at 88–92. Those contracts do not say that Rho is to engage personnel on the customer's behalf; they do not describe an agency relationship. The subject of the contracts before us was the sale of a service.

Rho supplied its services pursuant to purchase orders. Again, the plain language of the transactions before us show that this was a sale, a purchase, of services by one party from another. It was not a matter of one party acting on behalf of another. We should be governed by these plain words because the parties chose to be governed by those words and those words alone give a true picture of their relationship. The record shows that Rho began to think of itself as an agent only after the tax bill came. We are not required to credit such a self–interested characterization.

Rho's engineers were its employees, not third parties to an agency transaction. In the terms of Rule 159, Rho's contracts with its engineers were not made in the name of its customers nor on the account of the customer. All the business records before us refer to the engineers as Rho's employees, in both Rho's contracts with the engineers and its contracts with its customers. In hiring its engineers, Rho clearly did not treat them as third parties to an agency relationship. On the contrary, Rho took on substantial obligations to its engineer employees. Rho agreed to pay all the

withholding taxes, workers' compensation and unemployment insurance of the engineers, just like an ordinary employer. If Rho had been acting only on the account of its principal as contemplated in Rule 159, the engineers would have obligations to and rights against the principal alone.

Rho's compensation was also never treated as an agent's commission, as required by Rule 159. The contracts say "Price for Services". Rho was compensated based on the hours worked by the engineer in question. Rho was *not* compensated with a proportion of its engineer's compensation nor a proportion of its customer's profit from the engineer's work. Rho received a price for a service provided, calculated in the only reasonable manner available: as a function of the hours of service provided. Taking any faint resemblance between this and the payment of a commission as dispositive would require us to ignore everything else we know about this transaction.

In short, there is no sign in the record before us that Rho was treated as an agent of its customers in the ordinary course of its business. While the majority manages to obscure the issue, the question is really very simple. Is Rho's "agency." status the sort of *ad hoc* characterization that the requirements of WAC 458–20–159 were designed to eliminate? There is no need to remand this case to make that determination. Rho has engaged in an after–the–fact rationalization of its actions. The Board was not fooled. While we review its findings for errors of law, we also should defer to its expertise. This is a clear case where such deference would be appropriate.

### WAC 458–20–111 (Rule 111) Is Inapplicable Here

In remanding for a determination on agency, the majority assumes that if Rho is an agent it is free of all liabilities incurred in connection with its principal's business. That is, the majority assumes that all such costs are necessarily passed through to Rho's clients and cannot be counted as part of Rho's cost of doing business nor, consequently, as part of Rho's taxable gross revenue.

However, it is not true that an agent is always free of liability in matters connected with its principal's business. An agent can be liable in such matters on a variety of theories, some directly applicable to Rho's conduct here. It follows that, even if Rho is an agent, it still can incur costs and liabilities which are not passed through, and which ought be counted as part of its gross revenue—even if those costs are in some manner connected with its principal's business. The majority simply fails to consider this possibility.

In order to see why Rho's status as an agent does not necessarily make its engineers' salaries pass–through expenses, it is helpful to set the question of agency aside for a moment, and to apply the remainder of Rule 111. Approaching the case in this way makes it possible to see how a taxpayer's being an agent may or may not affect the calculation of gross income.

Rule 111 provides in part:

> The word "advance" as used herein, means money or credits received by a taxpayer from a customer or client with which the taxpayer is to pay costs or fees for the customer or client.
>
> The word "reimbursement" as used herein, means money or credits received from a customer or client to repay the taxpayer for money or credits expended by the taxpayer in payment of costs or fees for the client.
>
> The words "advance" and "reimbursement" apply only when the customer or client alone is liable for the payment of the fees or costs and when the taxpayer making the payment has no personal liability therefor, either primarily or secondarily, other than as agent for the customer or client.
>
> There may be excluded from the measure of tax amounts representing money or credit received by a taxpayer as reimbursement of an advance in accordance with the regular and usual custom of his business or profession.
>
> The foregoing is limited to cases wherein the taxpayer, as an incident to the business, undertakes, on behalf of the customer, guest or client, the payment of money, either upon an obligation owing by the customer, guest or client to a third person, or in procuring a service for the customer, guest or client which the taxpayer does not or cannot render and for which no liability attaches to the taxpayer. It does not apply to cases where the customer, guest or client makes advances to the taxpayer upon services to be rendered by the taxpayer or upon goods to

be purchased by the taxpayer in carrying on the business in which the taxpayer engages.

. . . .

. . . [N]o charge which represent an advance payment on the purchase price of an article or a cost of doing or obtaining business, even though such charge is made as a separate item, will be construed as an advance or reimbursement. Money so received constitutes a part of gross sales or gross income of the business, as the case may be.

WAC 458-20-111.

As the last paragraph quoted makes clear, the broad intent of the rule is to segregate those expenses which are part of a company's cost of doing business from those expenses which are not. The distinction arises from the very fact that the B&O tax is calculated on the basis of gross income. If costs of doing business were excluded from the taxable amount, the tax would be applied to a net, rather than a gross, figure. On the other hand, if a company functions only as a conduit of funds, those funds cannot be considered part of its income. Articulating this "pass-through" concept is the purpose of the remainder of Rule 111.

The basic tool the rule uses to make this distinction between costs of doing business and pass-through costs is liability on the part of the taxpayer. If the taxpayer is liable for the amounts in question, they are costs of doing business. If the taxpayer is not liable for the amounts at issue, the costs are by definition passed on and cannot be considered part of gross income.

If we adhere to the basic concept of liability to the taxpayer, it is clear that Rho's taxable gross income includes the salaries and wages it pays to the engineers it has hired. Rho is liable to the engineers for their compensation. Both the contracts between Rho and the engineers and between Rho and its clients explicitly so provide. Furthermore, Rho's contracts with its clients expressly provide that Rho shall pay all social security, income tax withholding, employment compensation, workers' compensation and similar fees payable in connection with the engineers'

employment. While these obligations are contained in the Rho–client contract, they are obligations which necessarily operate to the benefit of the engineers.[8] Because of this, the obligations could be enforced by the engineers. *Lonsdale v. Chesterfield,* 99 Wn.2d 353, 361, 662 P.2d 385 (1983). For Rule 111 purposes then, these obligations must be considered liabilities on the part of Rho to its engineers. Since Rho is liable for the cost of its engineers' employment, that cost is a cost of doing business which is not deductible under Rule 111.

These points can be seen clearly in distinguishing this case from our two previous cases on Rule 111. We recognized taxpayer liability as the determining factor in Rule 111 questions in both *Walthew, Warner, Keefe, Arron, Costello & Thompson v. Department of Rev.,* 103 Wn.2d 183, 691 P.2d 559 (1984) and *Christensen, O'Connor, Garrison & Havelka v. Department of Rev.,* 97 Wn.2d 764, 649 P.2d 839 (1982).

In *Christensen,* a Seattle law firm which assisted its clients in obtaining patents customarily arranged for the assistance of attorneys in Washington D.C. and for the services of draftsmen specializing in patent illustrations. The Seattle firm paid the Washington D.C. attorneys and the draftsmen, but was reimbursed by its clients and so deducted the amounts from its gross income under Rule 111. We upheld this deduction. A key point in the law firm's favor was the fact that all parties concerned agreed that the D.C. attorneys and the draftsmen were employed by the law firm's client, not the firm itself, and that the law firm was not liable to the D.C. attorneys or the draftsmen for payment. 97 Wn.2d at 769–71.

The difference between *Christensen* and this case could not be more clear. Where the law firm was free of liability for the costs at issue, Rho is unquestionably liable to its

---

[8]For example, the engineers are ultimately responsible for the payment of their taxes. Rho's failure to withhold pursuant to its contract with the client would breach a duty to the engineer.

engineers for their salaries and benefits. The Board of Tax Appeals found that relieving its clients from such liabilities is a crucial element in the service provided by Rho. Since the taxpayer's freedom from liability for the costs at issue is the dispositive factor under Rule 111, as *Christensen* shows, Rho cannot possibly qualify for a deduction under the rule.

In *Walthew,* we considered another deduction by a law firm under Rule 111, this time for expenses connected with litigation. Once again, the taxpayer's liability for the costs at issue was the decisive factor. Our decision to uphold the deduction turned on the fact that the firm could not take on liability for the expenses as a matter of law. 103 Wn.2d at 188.

Here, in contrast, Rho not only can take on liability for the costs in question; taking on those liabilities is the heart of the service it provides. Such liability is the determining factor under Rule 111, and this case is distinguishable from *Walthew* for the simple reason that in *Walthew* the taxpayer could not and did not take on liability, while in this case the taxpayer could and did do so.

Rho's situation is indistinguishable from the examples given in the rule itself of expenses which *may not* be excluded under Rule 111.

> [N]o exclusion is allowed with respect to amounts received by (1) a doctor for furnishing medicine or drugs as a part of his treatment; (2) a dentist for furnishing gold, silver or other property in conjunction with his services; (3) a garage for furnishing parts in connection with repairs; (4) a manufacturer or contractor for materials purchased in his own name or in the name of his customer if the manufacturer or contractor is obligated to the vendor for the payment of the purchase price, regardless of whether the customer may also be so obligated; (5) any person engaging in a service business or in the business of installing or repairing tangible personal property for charges made separately for transportation or traveling expense.

WAC 458–20–111. The engineers Rho provides to its clients are paid for by Rho and are therefore directly analogous to the doctor's medicine, the dentist's gold, the repairman's parts and the manufacturer's materials. The fact that all

these businesses recover their costs from their clients does not make those costs pass–through costs under Rule 111.

The majority is misled by the fact that Rho deals in personnel and, as shown below, by the concept of agency. But the fact is that Rho is a personnel service providing a product—personnel—to its clients. The engineers retained by Rho are, with all due respect to the engineers themselves, Rho's inventory. Like any expenditures for inventory, the salaries paid to the engineers are a cost of doing business which must be included in gross income.

The fact that Rho obtains inventory on special order, pursuant to criteria supplied by its clients, does not change the fact that the cost of the engineers is a cost of Rho's business. As an analogy, automobile dealers often call around to other dealers in order to find the right combination of model, color and features for a customer. But just because the dealer has provided that service, it does not follow that the cost of a car obtained and sold in that manner is deductible under Rule 111. The cost of the car to the dealer is a cost of doing business and part of his gross income. In Rho's case, it is tempting to stress the service part of the transaction because Rho's "inventory" consists of human beings, and professionals at that. However, the determining question under Rule 111 is whether Rho is liable for the cost of what it supplies—whatever it may be— such that the cost is a cost of doing business. Rho supplies its customers with engineers. There can be no doubt that Rho is liable for the engineers' salaries, that this is a cost of its business and that Rho is therefore not entitled to a deduction under Rule 111.

## AGENCY AND RULE 111

The passage in Rule 111 that has led to the majority's confusion is this:

> The words "advance" and "reimbursement" apply only when the customer or client alone is liable for the payment of the fees or costs and when the taxpayer making the payment has no personal liability therefor, either primarily or secondarily, *other than as agent for the customer or client.*

(Italics mine.) WAC 458–20–111. In *Christensen* and especially in *Walthew*, our analysis stressed the agency concept. Perhaps because of that, the majority has lost sight of the fact that the determining factor in Rule 111 analysis is the taxpayer's liability for the costs in question, not its status as an agent. While in *Christensen* and *Walthew* the concept of an agent worked as an adequate surrogate for non-liability, that is not always the case, and is clearly not the case here.

It is well established that an agent for a fully disclosed principal does not incur any liability to a third party with whom he contracts on the principal's behalf. Restatement (Second) of Agency § 320 (1958). It is likely that the drafters of Rule 111 had this principle in mind when they added the "agent" clause to the rule. Section 320 is probably the principle the court had in mind in *Christensen* and *Walthew*, when it equated costs incurred by an agent with pass–through costs under Rule 111. Clearly, the majority has the section 320 rule in mind when it makes the same assumption in this case.

However, the assumption that Rho's having the status of an agent will, by itself, relieve it of *all* possible liability to the engineers is simply not justified. Despite the fact that an agent for a disclosed principal does not become a party to the principal–third party contract, obligations from the agent to the third party can arise from the same transaction in a variety of ways.

The most obvious is the creation of a distinct contract between the agent (Rho) and the third party (engineers) at the same time as or in connection with the agency relationship with the principal (Rho's clients). The case of *Griffiths & Sprague Stevedoring Co. v. Bayly, Martin & Fay, Inc.*, 71 Wn.2d 679, 430 P.2d 600 (1967) illustrates the principle. Both parties in *Griffiths* were aviation insurance brokers. Bayly directed Griffiths to obtain insurance from Lloyd's of London, through Griffiths' London affiliate, for Bayly's client, Cisco Aircraft. Griffiths paid the premium, as was standard practice in the industry. Cisco went bankrupt and

Griffiths sued Bayly for the premium. Bayly argued that it was the agent for a disclosed principal, Cisco, and therefore could not be liable to Griffiths. The court held that Bayly was liable to Griffiths, *despite its status as an agent for Cisco,* on a separate contract between Griffiths and Bayly alone.

> We do not depart from the familiar rule that, when an agent makes a contract on behalf of a disclosed or partially disclosed principal whom he has power to bind, he does not thereby become liable for his principal's nonperformance. Restatement (Second), Agency § 328 (1958); 3 Am. Jur. 2d *Agency* § 294 (1962). But, regardless of the parties' position under the insurance code (RCW 48.17.020) [defining "broker" as an agent of the insured], it is the relationship between them in the instant transaction which governs here. If the facts surrounding the transaction allowed the jury to infer an agreement [between Bayly and Griffiths] to pay the premiums, then, under familiar and well–established rules, a reviewing court ought not disturb the verdict.

71 Wn.2d at 686.

Rho and its engineers are in the same situation as Bayly and Griffiths. Despite the fact that Rho is acting as an agent for its clients, there is a separate set of contractual obligations which obtain between Rho and its engineers alone. Rho must pay its engineers, see to it that withholding, social security, unemployment compensation and workers' compensation fees are paid on their behalf, ensure that they receive certain holidays and pay overtime when necessary. Like Bayly, Rho is liable on that contract regardless of the fact that it also has an agency relationship with another party which is intimately connected with its obligations to the engineers. Rho's status as an agent is not a complete defense to B&O tax liability, because it is not a complete defense to contractual liability to the engineers. Since Rho is liable to its engineers, the cost of those engineers is a cost of Rho's business and is not deductible under Rule 111.

The case of *Gray v. England,* 69 Wn.2d 52, 417 P.2d 357 (1966) also supports this analysis. In *Gray,* an escrow company was the agent of the buyer, England. England put the

company on notice that a portion of the escrow should be held for a third party, Gray. When the deal failed to close, the escrow was returned to England, but no notice was given to Gray. The court held that the escrow company was liable to Gray, *despite its status as an agent,* because it was a party to a third party beneficiary contract and owed a duty to Gray, the third party, on that ground.

This case is indistinguishable. As noted above, Rho is obliged in its contracts with its clients to pay the engineers' salaries and to pay taxes, workers' compensation and unemployment insurance fees in connection with the engineers' employment. The intent of both Rho and its clients in agreeing to these terms is to extend a benefit to the engineers: to compensate them for their work in accordance with applicable law. Given that the parties intend to confer a benefit on third parties, the contract is enforceable by those third parties, the engineers. This liability on the part of Rho to its engineers, regardless of its status as an agent for the client, again shows that the engineers' salaries are not deductible under Rule 111. Since Rho is liable, those costs are costs of doing business, not pass–through costs.

There is yet another theory on which liability from Rho to its engineers might exist, precluding deduction under Rule 111. Rho sometimes acts as an intermediary between its client and its engineers in determining the compensation to be paid. Rho undertakes to review its engineers' performance for the purpose of obtaining increased compensation for the engineer. Rho also sometimes represents engineers as independent contractors, not as employees of Rho itself. In these situations, Rho can be seen as the engineer's agent, with attendant liabilities.

The fact that Rho is an agent of its clients in these transactions does not preclude treating it as the agent of its engineers also. In other words, Rho can be seen as a broker. Brokerage relationships are common in the field of insurance, and are frequently identified as the justification for holding a defendant liable to the insured—for failure to obtain insurance, example—despite his status as an agent

for the insurance company. *See* Annot., *Liability of Insurance Broker or Agent to Insured for Failure To Procure Insurance,* 64 A.L.R.3d 398, 447–49 (1975); *Dailey v. Elicker,* 447 F. Supp. 436, 438 (D. Colo. 1978). The nature of a brokerage was stated in *Gay v. Lavina State Bank,* 61 Mont. 449, 457, 202 P. 753 (1921):

> Every broker is in a sense an agent, but every agent is not a broker. The chief feature which distinguishes a broker from other classes of agents is that he is an intermediary, or middleman, and, in accepting applications for insurance, acts in a certain sense as the agent of both parties to the transaction.

Here, Rho is in the business of bringing engineers together with manufacturers, and represents the interests of its engineers in the transaction just as much as the interests of its corporate clients. It arguably owes fiduciary duties to both. Whether it actually does owe such duties to its engineers need not be conclusively established here. The point is that the mere existence of an agency relationship between Rho and its clients is not sufficient to preclude the possibility of liability to its engineers. Remanding the case to determine whether Rho is an agent will not determine the central Rule 111 issue—whether Rho was liable for the cost of its engineers—and the record we already have indicates that Rho is liable, the costs in question are not pass–through costs and are therefore not deductible under the rule.

If we look at this case as a matter of construing the rule, the majority's approach is clearly indefensible. The question is how the taxpayer's being an agent for its customer or client relates to the rule's main requirement that the taxpayer have no liability for the costs in question. There are two possibilities. The "agent" clause may merely reiterate the nonliability requirement in different terms. Or, status as an agent may be a separate and distinct ground on which costs can be designated as "advances" and "reimbursements".

As I have shown above, the first interpretation is untenable because it simply is not true that status as an agent

necessarily precludes liability for the costs in question. There are at least three ways Rho can be seen as liable to its engineers, despite its status as an agent of its clients.

That leaves the second possibility: that agent status is a separate and distinct ground for deducting costs under Rule 111. The only difficulty with this interpretation is that it has no support in the logic of the B&O tax system and is inconsistent with the import of Rule 111 as a whole. The whole point of the rule is to distinguish between costs of doing business and pass–through costs, and the necessity of making that distinction arises out of the basic premise that B&O taxes are based on gross income, not net. There is no reason whatsoever to read Rule 111 as creating a deduction for expenses incurred in the course of an agency where those expenses are not also genuine pass–through costs. And, as explained above, their status as pass–through costs is a function of taxpayer liability.

By treating agency status alone as determinative, the majority gives credence to the second of these interpretations, suggesting that a taxpayer can obtain a deduction under Rule 111 merely by showing himself to be an agent. That interpretation of the rule is untenable. Not only is it not supported by the logic of the rule, it threatens to open a very wide hole in the B&O tax system. I cannot join in such a result.

## CONCLUSION

Rho sold customers a service. In allowing Rho to characterize its activities as an agency, the majority permits that sale to escape B&O taxation. Because many sales of services fall under the retail sales tax as well as the B&O tax, the majority's reasoning will permit many taxpayers to escape sales taxes as well as B&O tax. The loss of revenue will be enormous.

This is all the more regrettable given that Rho clearly is not an agent. Rho was a seller of services, and was always designated as such in every business record we have before us. The mere fact that it tried to find engineers that met its

customers' needs does not make it an agent; providing the right person for the job was simply part of Rho's service.

Even if Rho were an agent of its clients, that is not the issue in this case. The issue is whether the cost of its engineers is a cost of doing business or a true pass–through. That issue in turn is governed by whether Rho is liable for the costs in question. Since Rho is liable to its engineers for their salaries and benefits, those costs are a cost of doing business and are not deductible under Rule 111. I would affirm the decision of the Board of Tax Appeals.

UTTER, J., concurs with DORE, J.